# GOLDFARB ET UX. *v.* VIRGINIA STATE BAR ET AL.

No. 74–70. Argued March 25, 1975—Decided June 16, 1975

774

Burger, C. J., delivered the opinion of the Court, in which all other Members joined except Powell, J., who took no part in the consideration or decision of the case.

*Alan B. Morrison* argued the cause and filed briefs for petitioners.

*Andrew P. Miller,* Attorney General of Virginia, argued the cause for respondent Virginia State Bar. With him on the brief were *Anthony F. Troy,* Deputy Attorney General, and *Stuart H. Dunn,* Assistant Attorney General. *Lewis T. Booker* argued the cause for respondent Fairfax County Bar Assn. With him on the brief was *John H. Shenefield.*

*Solicitor General Bork* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Assistant Attorney General Kauper, Gerald P. Norton,* and *Howard E. Shapiro.**

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

We granted certiorari to decide whether a minimum-fee schedule for lawyers published by the Fairfax County Bar Association and enforced by the Virginia State Bar violates § 1 of the Sherman Act, 26 Stat. 209, as amended, 15 U. S. C. § 1. The Court of Appeals held that, although the fee schedule and enforcement mechanism substantially restrained competition among lawyers, publication of the schedule by the County Bar was outside the scope of the Act because the practice of law is not "trade or commerce," and enforcement of the schedule by the State Bar was exempt from the Sherman Act as state action as defined in *Parker* v. *Brown,* 317 U. S. 341 (1943).

## I

In 1971 petitioners, husband and wife, contracted to buy a home in Fairfax County, Va. The financing agency required them to secure title insurance; this required a title examination, and only a member of the Virginia State Bar could legally perform that service.[1]

---

*Eleanor M. Fox* filed a brief for the Association of the Bar of the City of New York as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed by *James D. Fellers* and *H. Blair White* for the American Bar Assn.; by *Richard C. McFarlain* for the National Organization of Bar Counsel; by *Leroy Jeffers* for the State Bar of Texas; by *Warren H. Resh* for the State Bar of Wisconsin; by *E. Robert Wallach* and *Walter J. Robinson* for the Bar Association of San Francisco; and by *Owen Rall* and *Peter M. Sfikas* for the American Dental Assn.

[1] Unauthorized Practice of Law, Opinion No. 17, Aug. 5, 1942, Virginia State Bar—Opinions 239 (1965).

Petitioners therefore contacted a lawyer who quoted them the precise fee suggested in a minimum-fee schedule published by respondent Fairfax County Bar Association; the lawyer told them that it was his policy to keep his charges in line with the minimum-fee schedule which provided for a fee of 1% of the value of the property involved. Petitioners then tried to find a lawyer who would examine the title for less than the fee fixed by the schedule. They sent letters to 36 other Fairfax County lawyers requesting their fees. Nineteen replied, and none indicated that he would charge less than the rate fixed by the schedule; several stated that they knew of no attorney who would do so.

The fee schedule the lawyers referred to is a list of recommended minimum prices for common legal services. Respondent Fairfax County Bar Association published the fee schedule although, as a purely voluntary association of attorneys, the County Bar has no formal power to enforce it. Enforcement has been provided by respondent Virginia State Bar which is the administrative agency [2] through which the Virginia Supreme Court regulates the practice of law in that State; membership in the State Bar is required in order to practice in Virginia.[3] Although the State Bar has never taken formal disciplinary action to compel adherence to any fee sched-

---

[2] Virginia Code Ann. § 54–49 (1972) provides:

"The Supreme Court of Appeals may, from time to time, prescribe, adopt, promulgate and amend rules and regulations organizing and governing the association known as the Virginia State Bar, composed of the attorneys at law of this State, to act as an administrative agency of the Court for the purpose of investigating and reporting the violation of such rules and regulations as are adopted by the Court under this article to a court of competent jurisdiction for such proceedings as may be necessary, and requiring all persons practicing law in this State to be members thereof in good standing."

[3] *Ibid.*

ule, it has published reports[4] condoning fee schedules, and has issued two ethical opinions[5] indicating that fee schedules cannot be ignored. The most recent opinion states that "evidence that an attorney *habitually* charges

[4] In 1962 the State Bar published a minimum-fee-schedule report that listed a series of fees and stated that they "represent the considered judgment of the Committee [on Economics of Law Practice] as to [a] fair minimum fee in each instance." The report stated, however, that the fees were not mandatory, and it recommended only that the State Bar *consider* adopting such a schedule. Nevertheless, shortly thereafter the County Bar adopted its own minimum-fee schedule that purported to be "a conscientious effort to show lawyers in their true perspective of dignity, training and integrity." The suggested fees for title examination were virtually identical to those in the State Bar report. In accord with Opinion 98 of the State Bar Committee on Legal Ethics the schedule stated that, although there is an ethical duty to charge a lower fee in a deserving case, if a lawyer

" 'purely for his own advancement, intentionally and regularly bills less than the customary charges of the bar for similar services . . . [in order to] increase his business with resulting personal gain, it becomes a form of solicitation contrary to Canon 27 and also a violation of Canon 7, which forbids the efforts of one lawyer to encroach upon the employment of another.' " App. 30.

In 1969 the State Bar published a second fee-schedule report that, as it candidly stated, "reflect[ed] a general scaling up of fees for legal services." The report again stated that no local bar association was bound by its recommendations; however, respondent County Bar again quickly moved to publish an updated minimum-fee schedule, and generally to raise fees. The new schedule stated that the fees were not mandatory, but tempered that by referring again to Opinion 98. This time the schedule also stated that lawyers should feel free to charge *more* than the recommended fees; and to avoid condemnation of higher fees charged by some lawyers, it cautioned County Bar members that "to . . . publicly criticize lawyers who charge more than the suggested fees herein might in itself be evidence of solicitation . . . ."

[5] Virginia State Bar Committee on Legal Ethics, Opinion No. 98, June 1, 1960; Virginia State Bar Committee on Legal Ethics, Opinion No. 170, May 28, 1971.

less than the suggested minimum fee schedule adopted by his local bar Association, raises a presumption that such lawyer is guilty of misconduct . . . ." [6]

Because petitioners could not find a lawyer willing to charge a fee lower than the schedule dictated, they had their title examined by the lawyer they had first contacted. They then brought this class action against the State Bar and the County Bar [7] alleging that the operation of the minimum-fee schedule, as applied to fees for legal services relating to residential real estate transactions, constitutes price fixing in violation of § 1 of the Sherman Act. Petitioners sought both injunctive relief and damages.

After a trial solely on the issue of liability the District Court held that the minimum-fee schedule violated the Sherman Act.[8] 355 F. Supp. 491 (ED Va. 1973). The

---

[6] *Ibid.* The parties stipulated that these opinions are a substantial influencing factor in lawyers' adherence to the fee schedules. One reason for this may be because the State Bar is required by statute to "investigat[e] and report . . . the violation of . . . rules and regulations as are adopted by the [Virginia Supreme Court] to a court of competent jurisdiction for such proceedings as may be necessary . . . ." Va. Code Ann. § 54-49 (1972). Therefore any lawyer who contemplated ignoring the fee schedule must have been aware that professional sanctions were possible, and that an enforcement mechanism existed to administer them.

[7] Two additional county bar associations were originally named as defendants but they agreed to a consent judgment under which they were directed to cancel their existing fee schedules, and were enjoined from adopting, publishing, or distributing any future schedules of minimum or suggested fees. Damage claims against these associations were then dismissed with prejudice.

[8] The court was satisfied that interstate commerce was sufficiently affected to sustain jurisdiction under the Sherman Act because a significant portion of the funds and insurance involved in the purchase of homes in Fairfax County comes from outside the State of Virginia. 355 F. Supp 491, 497 (ED Va. 1973).

court viewed the fee-schedule system as a significant reason for petitioners' failure to obtain legal services for less than the minimum fee, and it rejected the County Bar's contention that as a "learned profession" the practice of law is exempt from the Sherman Act.

Both respondents argued that their actions were also exempt from the Sherman Act as state action. *Parker* v. *Brown, supra.* The District Court agreed that the Virginia State Bar was exempt under that doctrine because it is an administrative agency of the Virginia Supreme Court, and more important, because its "minor role in this matter . . . derived from the judicial and 'legislative command of the State and was not intended to operate or become effective without that command.' " The County Bar, on the other hand, is a private organization and was under no compulsion to adopt the fee schedule recommended by the State Bar. Since the County Bar chose its own course of conduct the District Court held that the antitrust laws "remain in full force and effect as to it." The court enjoined the fee schedule, 15 U. S. C. § 26, and set the case down for trial to ascertain damages. 15 U. S. C. § 15.

The Court of Appeals reversed as to liability. 497 F. 2d 1 (CA4 1974). Despite its conclusion that it "is abundantly clear from the record before us that the fee schedule and the enforcement mechanism supporting it act as a substantial restraint upon competition among attorneys practicing in Fairfax County," *id.,* at 13, the Court of Appeals held the State Bar immune under *Parker* v. *Brown, supra,* and held the County Bar immune because the practice of law is not "trade or commerce" under the Sherman Act. There has long been judicial recognition of a limited exclusion of "learned professions" from the scope of the antitrust laws, the court said; that exclusion is based upon the special form

of regulation imposed upon the professions by the States, and the incompatibility of certain competitive practices with such professional regulation. It concluded that the promulgation of a minimum-fee schedule is one of "those matters with respect to which an accord must be reached between the necessities of professional regulation and the dictates of the antitrust laws." The accord reached by that court was to hold the practice of law exempt from the antitrust laws.

Alternatively, the Court of Appeals held that respondents' activities did not have sufficient effect on interstate commerce to support Sherman Act jurisdiction. Petitioners had argued that the fee schedule restrained the business of financing and insuring home mortgages by inflating a component part of the total cost of housing, but the court concluded that a title examination is generally a local service, and even where it is part of a transaction which crosses state lines its effect on commerce is only "incidental," and does not justify federal regulation.

We granted certiorari, 419 U. S. 963 (1974), and are thus confronted for the first time with the question of whether the Sherman Act applies to services performed by attorneys in examining titles in connection with financing the purchase of real estate.

II

Our inquiry can be divided into four steps: did respondents engage in price fixing? If so, are their activities in interstate commerce or do they affect interstate commerce? If so, are the activities exempt from the Sherman Act because they involve a "learned profession?" If not, are the activities "state action" within the meaning of *Parker* v. *Brown*, 317 U. S. 341 (1943), and therefore exempt from the Sherman Act?

## A

The County Bar argues that because the fee schedule is merely advisory, the schedule and its enforcement mechanism do not constitute price fixing. Its purpose, the argument continues, is only to provide legitimate information to aid member lawyers in complying with Virginia professional regulations. Moreover, the County Bar contends that in practice the schedule has not had the effect of producing fixed fees. The facts found by the trier belie these contentions, and nothing in the record suggests these findings lack support.

A purely advisory fee schedule issued to provide guidelines, or an exchange of price information without a showing of an actual restraint on trade, would present us with a different question, e. g., *American Column Co.* v. *United States,* 257 U. S. 377 (1921); *Maple Flooring Assn.* v. *United States,* 268 U. S. 563, 580 (1925). But see *United States* v. *National Assn. of Real Estate Boards,* 339 U. S. 485, 488–489, 495 (1950). The record here, however, reveals a situation quite different from what would occur under a purely advisory fee schedule. Here a fixed, rigid price floor arose from respondents' activities: every lawyer who responded to petitioners' inquiries adhered to the fee schedule, and no lawyer asked for additional information in order to set an individualized fee. The price information disseminated did not concern past standards, cf. *Cement Mfrs. Protective Assn.* v. *United States,* 268 U. S. 588 (1925), but rather minimum fees to be charged in future transactions, and those minimum rates were increased over time. The fee schedule was enforced through the prospect of professional discipline from the State Bar, and the desire of attorneys to comply with announced professional norms, see generally *American Column Co., supra,* at 411;

the motivation to conform was reinforced by the assurance that other lawyers would not compete by underbidding. This is not merely a case of an agreement that may be inferred from an exchange of price information, *United States* v. *Container Corp.,* 393 U. S. 333, 337 (1969), for here a naked agreement was clearly shown, and the effect on prices is plain.[9] *Id.,* at 339 (Fortas, J., concurring).

Moreover, in terms of restraining competition and harming consumers like petitioners the price-fixing activities found here are unusually damaging. A title examination is indispensable in the process of financing a real estate purchase, and since only an attorney licensed to practice in Virginia may legally examine a title, see n. 1, *supra,* consumers could not turn to alternative sources for the necessary service. All attorneys, of course, were practicing under the constraint of the fee schedule. See generally *United States* v. *Container Corp., supra,* at 337. The County Bar makes much of the fact that it is a voluntary organization; however, the ethical opinions issued by the State Bar provide that any lawyer, whether or not a member of his county bar associ-

---

[9] The Court of Appeals accurately depicted the situation:

"[I]t is clear from the record that all or nearly all of the [County Bar] members charged fees equal to or exceeding the fees set forth in the schedule for title examinations and other services involving real estate." 497 F. 2d 1, 12 (CA4 1974).

" 'A significant reason for the inability of [petitioners] to obtain legal services . . . for less than the fee set forth in the Minimum Fee Schedule . . . was the operation of the minimum fee schedule system.' " *Id.,* at 4.

"It is abundantly clear from the record before us that the fee schedule and the enforcement mechanism supporting it act as a substantial restraint upon competition among attorneys practicing in Fairfax County." *Id.,* at 13.

ation, may be disciplined for *"habitually* charg[ing] less than the suggested minimum fee schedule adopted by his local bar Association . . . ." See *supra,* at 777–778, and n. 4. These factors coalesced to create a pricing system that consumers could not realistically escape. On this record respondents' activities constitute a classic illustration of price fixing.

## B

The County Bar argues, as the Court of Appeals held, that any effect on interstate commerce caused by the fee schedule's restraint on legal services was incidental and remote. In its view the legal services, which are performed wholly intrastate, are essentially local in nature and therefore a restraint with respect to them can never substantially affect interstate commerce. Further, the County Bar maintains, there was no showing here that the fee schedule and its enforcement mechanism increased fees, and that even if they did there was no showing that such an increase deterred any prospective homeowner from buying in Fairfax County.

These arguments misconceive the nature of the transactions at issue and the place legal services play in those transactions. As the District Court found,[10] "a significant portion of funds furnished for the purchasing of homes in Fairfax County comes from without the State of Virginia," and "significant amounts of loans on Fairfax County real estate are guaranteed by the United States Veterans Administration and Department of Housing and Urban Development, both headquartered in the District of Columbia." Thus in this class action the transactions which create the need for the particular legal

---

[10] The Court of Appeals did not disturb the District Court's findings of fact. It simply disagreed on the conclusions of law drawn therefrom.

services in question frequently are interstate transactions. The necessary connection between the interstate transactions and the restraint of trade provided by the minimum-fee schedule is present because, in a practical sense,[11] title examinations are necessary in real estate transactions to assure a lien on a valid title of the borrower. In financing realty purchases lenders require, "as a condition of making the loan, that the title to the property involved be examined . . . ."[12] Thus a title examination is an integral part of an interstate transaction [13] and this Court has long held that

> "there is an obvious distinction to be drawn between a course of conduct wholly within a state and conduct which is an inseparable element of a larger program dependent for its success upon activity which affects commerce between the states."

---

[11] It is in a practical sense that we must view an effect on interstate commerce, *Swift & Co.* v. *United States,* 196 U. S. 375, 398 (1905); *Mandeville Island Farms, Inc.* v. *American Crystal Sugar Co.,* 334 U. S. 219, 233 (1948).

[12] 355 F. Supp., at 494.

[13] The County Bar relies on *United States* v. *Yellow Cab Co.,* 332 U. S. 218 (1947), to support its argument that the "essentially local" legal services at issue here are beyond the Sherman Act. There we held, *inter alia,* that intrastate taxi trips that occurred at the start and finish of interstate rail travel were "too unrelated to interstate commerce to constitute a part thereof within the meaning of the Sherman Act." *Id.,* at 230. The ride to the railway station, we said, "[f]rom the standpoints of time and continuity . . . may be quite distinct and separate from the interstate journey." *Id.,* at 232. Here, on the contrary, the legal services are coincidental with interstate real estate transactions in terms of time, and, more important, in terms of continuity they are essential. Indeed, it would be more apt to compare the legal services here with a taxi trip between stations to change trains in the midst of an interstate journey. In *Yellow Cab* we held that such a trip was a part of the stream of commerce. *Id.,* at 228–229.

*United States* v. *Frankfort Distilleries,* 324 U. S. 293, 297 (1945).

See *United States* v. *Yellow Cab Co.,* 332 U. S. 218, 228–229 (1947).

Given the substantial volume of commerce involved,[14] and the inseparability of this particular legal service from the interstate aspects of real estate transactions, we conclude that interstate commerce has been sufficiently affected. See *Montague & Co.* v. *Lowry,* 193 U. S. 38, 45–46 (1904); *United States* v. *Women's Sportswear Assn.,* 336 U. S. 460, 464–465 (1949).

The fact that there was no showing that home buyers were discouraged by the challenged activities does not mean that interstate commerce was not affected. Otherwise, the magnitude of the effect would control, and our cases have shown that, once an effect is shown, no specific magnitude need be proved. *E. g., United States* v. *McKesson & Robbins, Inc.,* 351 U. S. 305, 310 (1956). Nor was it necessary for petitioners to prove that the fee schedule raised fees. Petitioners clearly proved that the fee schedule fixed fees and thus "deprive[d] purchasers or consumers of the advantages which they derive from free competition." *Apex Hosiery Co.* v. *Leader,* 310 U. S. 469, 501 (1940). See *United States* v. *Socony-Vacuum Oil Co.,* 310 U. S. 150 (1940).

Where, as a matter of law or practical necessity, legal services are an integral part of an interstate transaction, a restraint on those services may substantially affect commerce for Sherman Act purposes. Of course, there may be legal services that involve interstate commerce in other fashions, just as there may be legal services that

---

[14] 355 F. Supp., at 497.

have no nexus with interstate commerce and thus are beyond the reach of the Sherman Act.

## C

The County Bar argues that Congress never intended to include the learned professions within the terms "trade or commerce" in § 1 of the Sherman Act,[15] and therefore the sale of professional services is exempt from the Act. No explicit exemption or legislative history is provided to support this contention; rather, the existence of state regulation seems to be its primary basis. Also, the County Bar maintains that competition is inconsistent with the practice of a profession because enhancing profit is not the goal of professional activities; the goal is to provide services necessary to the community.[16] That, indeed, is the classic basis traditionally

---

[15] The County Bar cites phrases in several cases that implied the practice of a learned profession is not "trade or commerce" under the antitrust laws. *E. g., Federal Club* v. *National League,* 259 U. S. 200, 209 (1922) ("a firm of lawyers sending out a member to argue a case . . . does not engage in . . . commerce because the lawyer . . . goes to another State"); *FTC* v. *Raladam Co.,* 283 U. S. 643, 653 (1931) ("medical practitioners . . . follow a profession and not a trade . . ."); *Atlantic Cleaners & Dyers* v. *United States,* 286 U. S. 427, 436 (1932); *United States* v. *National Assn. of Real Estate Boards,* 339 U. S. 485, 490 (1950). These citations are to passing references in cases concerned with other issues; and, more important, until the present case it is clear that we have not attempted to decide whether the practice of a learned profession falls within § 1 of the Sherman Act. In *National Assn. of Real Estate Boards,* we specifically stated that the question was still open, 339 U. S., at 492, as we had done earlier in *American Medical Assn.* v. *United States,* 317 U. S. 519, 528 (1943).

[16] The reason for adopting the fee schedule does not appear to have been wholly altruistic. The first sentence in respondent State Bar's 1962 Minimum Fee Schedule Report states:
" 'The lawyers have slowly, but surely, been committing economic suicide as a profession.' " Virginia State Bar, Minimum Fee Schedule Report 1962, p. 3, App. 20.

advanced to distinguish professions from trades, businesses, and other occupations, but it loses some of its force when used to support the fee control activities involved here.

In arguing that learned professions are not "trade or commerce" the County Bar seeks a total exclusion from antitrust regulation. Whether state regulation is active or dormant, real or theoretical, lawyers would be able to adopt anticompetitive practices with impunity. We cannot find support for the proposition that Congress intended any such sweeping exclusion. The nature of an occupation, standing alone, does not provide sanctuary from the Sherman Act, *Associated Press* v. *United States,* 326 U. S. 1, 7 (1945), nor is the public-service aspect of professional practice controlling in determining whether § 1 includes professions. *United States* v. *National Assn. of Real Estate Boards,* 339 U. S., at 489. Congress intended to strike as broadly as it could in § 1 of the Sherman Act, and to read into it so wide an exemption as that urged on us would be at odds with that purpose.

The language of § 1 of the Sherman Act, of course, contains no exception. "Language more comprehensive is difficult to conceive." *United States* v. *South-Eastern Underwriters Assn.,* 322 U. S. 533, 553 (1944). And our cases have repeatedly established that there is a heavy presumption against implicit exemptions, *United States* v. *Philadelphia National Bank,* 374 U. S. 321, 350–351 (1963); *California* v. *FPC,* 369 U. S. 482, 485 (1962). Indeed, our cases have specifically included the sale of services within § 1. *E. g., American Medical Assn.* v. *United States,* 317 U. S. 519 (1943); *Radovich* v. *National Football League,* 352 U. S. 445 (1957). Whatever else it may be, the examination of a land title is a service; the exchange of such a service for money is "commerce"

in the most common usage of that word. It is no disparagement of the practice of law as a profession to acknowledge that it has this business aspect,[17] and § 1 of the Sherman Act

"[o]n its face . . . shows a carefully studied attempt to bring within the Act every person engaged in business whose activities might restrain or monopolize commercial intercourse among the states." *United States* v. *South-Eastern Underwriters Assn., supra,* at 553.

In the modern world it cannot be denied that the activities of lawyers play an important part in commercial intercourse, and that anticompetitive activities by lawyers may exert a restraint on commerce.

## D

In *Parker* v. *Brown,* 317 U. S. 341 (1943), the Court held that an anticompetitive marketing program which "derived its authority and its efficacy from the legislative command of the state" was not a violation of the Sherman Act because the Act was intended to regulate private practices and not to prohibit a State from imposing a restraint as an act of government. *Id.,* at 350–352; *Olsen* v. *Smith,* 195 U. S. 332, 344–345 (1904): Respondent State Bar and respondent County Bar both seek to avail themselves of this so-called state-action exemption.

---

[17] The fact that a restraint operates upon a profession as distinguished from a business is, of course, relevant in determining whether that particular restraint violates the Sherman Act. It would be unrealistic to view the practice of professions as interchangeable with other business activities, and automatically to apply to the professions antitrust concepts which originated in other areas. The public service aspect, and other features of the professions, may

Through its legislature Virginia has authorized its highest court to regulate the practice of law.[18] That court has adopted ethical codes which deal in part with fees, and far from exercising state power to authorize binding price fixing, explicitly directed lawyers not "to be controlled" by fee schedules.[19] The State Bar,

---

require that a particular practice, which could properly be viewed as a violation of the Sherman Act in another context, be treated differently. We intimate no view on any other situation than the one with which we are confronted today.

[18] Virginia Code Ann. § 54-48 (1972) provides:

"Rules and regulations defining practice of law and prescribing codes of ethics and disciplinary procedure.—The Supreme Court of Appeals may, from time to time, prescribe, adopt, promulgate and amend rules and regulations:

"(a) Defining the practice of law.

"(b) Prescribing a code of ethics governing the professional conduct of attorneys at law and a code of judicial ethics.

"(c) Prescribing procedure for disciplining, suspending, and disbarring attorneys at law."

In addition, the Supreme Court of Virginia, has inherent power to regulate the practice of law in that State. *Button* v. *Day*, 204 Va. 547, 132 S. E. 2d 292 (1963). See *Lathrop* v. *Donohue*, 367 U. S. 820 (1961).

[19] In 1938 the Supreme Court of Virginia adopted Rules for the Integration of the Virginia State Bar, and Rule II, § 12, dealt with the procedure for setting fees. Among six factors that court directed to be considered in setting a fee were "the customary charges of the Bar for similar services." The court also directed that

"[i]n determining the customary charges of the Bar for similar services, it is proper for a lawyer to consider a schedule of minimum fees adopted by a Bar Association, but *no lawyer should permit himself to be controlled* thereby or to follow it as his sole guide in determining the amount of his fee." Rules for Integration of the Virginia State Bar, 171 Va. xvii, xxiii. (Emphasis supplied.)

In 1970 the Virginia Supreme Court amended the 1938 rules in part, and adopted the Code of Professional Responsibility, effective Jan-

a state agency by law,[20] argues that in issuing fee schedule reports and ethical opinions dealing with fee schedules it was merely implementing the fee provisions of the ethical codes. The County Bar, although it is a voluntary association and not a state agency, claims that the ethical codes and the activities of the State Bar "prompted" it to issue fee schedules and thus its actions, too, are state action for Sherman Act purposes.

The threshold inquiry in determining if an anticompetitive activity is state action of the type the Sherman Act was not meant to proscribe is whether the activity is required by the State acting as sovereign. *Parker v. Brown,* 317 U. S., at 350–352; *Continental Co. v. Union Carbide,* 370 U. S. 690, 706–707 (1962). Here we need not inquire further into the state-action question because it cannot fairly be said that the State of Virginia through its Supreme Court Rules required the anticompetitive activities of either respondent. Respondents have pointed to no Virginia statute requiring their activities; state law simply does not refer to fees, leaving regulation of the profession to the Virginia Supreme Court; although the Supreme Court's ethical codes mention advisory fee schedules they do not direct either respondent to supply them, or require the type of price floor which arose from respondents' activities.

---

uary 1, 1971. 211 Va. 295 (1970). Certain of its provisions also dealt with the fee-setting procedure. In EC 2–18 lawyers were told again that fees vary according to many factors, but that "[s]uggested fee schedules and economic reports of state and local bar associations provide some guidance on the subject of reasonable fees." 211 Va., at 302. In DR 2–106 (B), which detailed eight factors that should be considered in avoiding an excessive fee, one of the factors was "[t]he fee customarily charged in the locality for similar legal services." DR 2–106 (B)(3). 211 Va., at 313.

[20] See *supra,* at 776 n. 2.

Although the State Bar apparently has been granted the power to issue ethical opinions, there is no indication in this record that the Virginia Supreme Court approves the opinions. Respondents' arguments, at most, constitute the contention that their activities complemented the objective of the ethical codes. In our view that is not state action for Sherman Act purposes. It is not enough that, as the County Bar puts it, anticompetitive conduct is "prompted" by state action; rather, anticompetitive activities must be compelled by direction of the State acting as a sovereign.

The fact that the State Bar is a state agency for some limited purposes does not create an antitrust shield that allows it to foster anticompetitive practices for the benefit of its members.[21] Cf. *Gibson* v. *Berryhill*, 411 U. S. 564, 578–579 (1973). The State Bar, by providing that

---

[21] The District Court stated that the State Bar acted in only a "minor role" as far as the price fixing was concerned, 355 F. Supp., at 496, and one member of the Court of Appeals panel was prepared to exonerate the State Bar because its participation was so minimal as to be insufficient to impose Sherman Act liability. 497 F. 2d, at 21 (Craven, J., concurring and dissenting). Of course, an alleged participant in a restraint of trade may have so insubstantial a connection with the restraint that liability under the Sherman Act would not be found, see *United States* v. *National Assn. of Real Estate Boards*, 339 U. S., at 495; however, that is not the case here. The State Bar's fee schedule reports provided the impetus for the County Bar, on two occasions, to adopt minimum-fee schedules. More important, the State Bar's ethical opinions provided substantial reason for lawyers to comply with the minimum-fee schedules. Those opinions threatened professional discipline for habitual disregard of fee schedules, and thus attorneys knew their livelihood was in jeopardy if they did so. Even without that threat the opinions would have constituted substantial reason to adhere to the schedules because attorneys could be expected to comply in order to assure that they did not discredit themselves by departing from professional norms, and perhaps betraying their professional oaths.

deviation from County Bar minimum fees may lead to disciplinary action, has voluntarily joined in what is essentially a private anticompetitive activity, and in that posture cannot claim it is beyond the reach of the Sherman Act.[22] *Parker* v. *Brown, supra,* at 351–352. Its activities resulted in a rigid price floor from which petitioners, as consumers, could not escape if they wished to borrow money to buy a home.

## III

We recognize that the States have a compelling interest in the practice of professions within their boundaries, and that as part of their power to protect the public health, safety, and other valid interests they have broad power to establish standards for licensing practitioners and regulating the practice of professions. We also recognize that in some instances the State may decide that "forms of competition usual in the business world may be demoralizing to the ethical standards of a profession." *United States* v. *Oregon State Medical Society,* 343 U. S. 326, 336 (1952). See also *Semler* v. *Oregon State Board of Dental Examiners,* 294 U. S. 608, 611–613 (1935). The interest of the States in regulating lawyers is especially great since lawyers are essential to the primary governmental function of administering justice, and have historically been "officers of the courts." See *Sperry* v. *Florida ex rel. Florida Bar,* 373 U. S. 379, 383 (1963); *Cohen* v. *Hurley,* 366 U. S. 117, 123–124 (1961); *Law Students Research Council* v. *Wadmond,* 401 U. S. 154,

---

[22] The State Bar also contends that it is protected by the Eleventh Amendment. See *Edelman* v. *Jordan,* 415 U. S. 651 (1974). Petitioners dispute this contention, and the District Court had no occasion to reach it in view of its holding. Given the record before us we intimate no view on the issue, leaving it for the District Court on remand.

157 (1971). In holding that certain anticompetitive conduct by lawyers is within the reach of the Sherman Act we intend no diminution of the authority of the State to regulate its professions.

The judgment of the Court of Appeals is reversed and the case is remanded to that court with orders to remand to the District Court for further proceedings consistent with this opinion.

*Reversed and remanded.*

MR. JUSTICE POWELL took no part in the consideration or decision of this case.