Will S. GUTHRIE, Walter C. Guthrie, Walter C. Guthrie, Jr., Guthrie Aircraft, Inc., Batavia Aviation, Inc., Plaintiffs,

v.

GENESEE COUNTY, NEW YORK, Prior Aviation Service, Inc., Defendants.

No. Civ–79–142.

United States District Court, W. D. New York.

Aug. 5, 1980.

Dempsey & Dempsey, Buffalo, N. Y. (John M. Dempsey, Buffalo, N. Y., of counsel), for plaintiffs.

Phillips, Lytle, Hitchcock, Blaine & Huber, Buffalo, N. Y. (Alexander C. Cordes and Paul K. Stecker, Buffalo, N. Y., of counsel), for defendant Genesee County.

Diebold & Millonzi, Buffalo, N. Y. (Edward J. Wagner, Buffalo, N. Y., of counsel), for defendant Prior Aviation Service, Inc.

CURTIN, Chief Judge.

This action relates to the operation of the Genesee County Airport which is located near Batavia, New York, and owned by Genesee County ["County"], one of the defendants. Presently before the court for decision are the motions to dismiss for failure to state a claim brought by the County and Prior Aviation Service, Inc. ["Prior"], the other defendant. For the purposes of these motions to dismiss under Rule 12(b)(6), the court must accept the plaintiffs' factual allegations as true.

The individual plaintiffs in this case, Will S. Guthrie, Walter C. Guthrie, and Walter C. Guthrie, Jr., are the sole shareholders and officers of the two corporate plaintiffs, Guthrie Aircraft, Inc. and Batavia Aviation, Inc. On or about May 28, 1977, the County terminated Batavia Aviation as the fixed base operator of the airport and, on July 1, 1977, entered into an agreement with the defendant Prior pursuant to which Prior became the fixed base operator at the airport.[1] The complaint alleges that the defendants have contracted, combined and conspired to restrain trade in violation of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2, with the intent to eliminate the plaintiffs as competitors in the air charter business. Plaintiffs also claim that the County has granted Prior an exclusive right to use the Genesee County Airport for air carrier activity, and has otherwise discriminated against the plaintiffs, in violation of the Federal Aviation Act ["FAA"], 49 U.S.C. §§ 1301, et seq., and § 1349(a) in particular.

Plaintiffs' complaint includes six counts, all of which contain factual allegations relating to the defendants' alleged exclusion of the plaintiffs from the Genesee County Airport. A summary of the factual situation is necessary for an understanding of defendants' motions. Sometime after the County terminated its agreement with Batavia Aviation, the County solicited bids for a contract to operate the airport, an effort which was unsuccessful. The County, however, subsequently accepted an offer by Prior to lease and operate the airport and, as noted above, Prior began its operation as fixed base operator on or about July 1, 1977. The plaintiffs allege that thereafter the County, together with Prior, forced Batavia Aviation and Guthrie Aircraft out of the airport terminal building and that the defendants have refused to allow plaintiffs to have any office space or "client information" in the terminal. It is also alleged that the County, with the knowledge and con-

1. The district court in *Pinehurst Airlines, Inc. v. Resort Air Services, Inc.*, 476 F.Supp. 543, 553 (M.D.N.C.1979), provided a description of a fixed base operator ["FBO"]: "[A]n FBO provides services similar to those that a service station provides for those who operate automobiles."

sent of Prior, forced plaintiffs to remove their tools from the maintenance hangar at the airport, although all other parties renting hangars at the airport were allowed to continue their use of the maintenance hangar. Moreover, the County, with the consent of Prior, is said to have informed the individual plaintiffs on June 27, 1977 that Aprils Instrument Service, Inc. ["Aprils"], occupying the second floor of the maintenance hangar, must vacate by June 30, 1977, ultimately resulting in the removal of Aprils and the "forced sale" of the individuals' 51% controlling interest in Aprils, at a loss of $25,000. Plaintiffs also claim that Prior, immediately upon entering its agreement with the County, told plaintiffs that Prior would need *all* of the space at the airport for its own operations, which is allegedly untrue.

In further steps to force plaintiffs out of the airport, plaintiffs allege that Prior, in concert with the County, raised the hangar rent 100% for plaintiffs only, and imposed an additional 100% surcharge upon the plaintiffs alone. This is said to have forced plaintiffs out of the Genesee County Airport. When, to avoid this higher rent and surcharge, the plaintiffs moved their airplanes to private property adjacent to airport runways, the defendants allegedly erected a snowfence; as a result plaintiffs' access to the airport was blocked and one airplane was "trapped" in a hangar and rendered useless to plaintiffs, who consequently had to sell the airplane at a loss.

The plaintiffs also claim that the County has refused to allow the Exxon Corporation to deliver any aircraft fuel to Batavia Aviation or to allow Batavia Aviation to deliver fuel on its own. Rather, the County has allegedly forced the plaintiffs to allow it to purchase fuel from Exxon under Batavia Aviation's name.

Finally, the plaintiffs allege that the County has received in the past federal funds to improve its airport pursuant to an agreement with the federal government wherein the County agreed not to discriminate between air carriers using the facility. Plaintiffs allege that the County and Prior have conspired to violate that agreement and have, in fact, discriminated against Batavia Aviation with respect to rental and other rates at the Genesee County Airport. Indeed, plaintiffs allege that the County has entered into an agreement with Prior granting Prior an exclusive right to engage in air carrier activity at the airport, in violation of the FAA. The complaint also states that, at the time of its termination, Batavia Aviation was the only certified air carrier using the Genesee County Airport but that Prior is also a certified air carrier. The plaintiff's claim that the County and Prior have conspired to eliminate and prevent plaintiffs' air carrier business at the airport.[2]

The defendants have moved to dismiss plaintiffs' claim on the following grounds. First, the individual as opposed to the corporate plaintiffs are said to lack standing because the complaint fails to allege any direct injury from the alleged antitrust violation which they have suffered as a result of the defendants' actions. Second, the defendants contend that the Sherman Antitrust Act does not apply to conduct undertaken by a local government, like Genesee County, pursuant to state legislation which authorizes a restriction of competition. Prior argues additionally that the alleged conduct of the defendants does not violate the antitrust laws in any case. Third, the defendants argue that the plaintiffs have no

---

2. The defendants have categorized the various counts in plaintiffs' complaint as setting forth only two federal claims, a Sherman Act claim in Count I and an FAA claim in Count VI, the rest being pendent state claims. Although plaintiffs' complaint could be more clearly drawn, a broad reading suggests that all of the counts are interrelated and form part of their antitrust and FAA claims. Each count clearly realleges each allegation previously made in the preceding counts. Moreover, at the very least, Counts II, III, and IV elaborate and form part of the antitrust claim and Count V appears related to plaintiffs' FAA claim. To the extent that distinct state law claims are also presented (e. g., defendants characterize Count V as a breach of contract claim), defendants' motion to dismiss these must fail because of the court's decision as to the antitrust claim.

standing under the FAA because no private right of action exists for the violation of the Act alleged in the complaint. Moreover, assuming that a private cause of action exists under the FAA, defendants assert that plaintiffs' claim is subject to the primary jurisdiction of the Federal Aviation Administration, and this court should decline to exercise its jurisdiction pending a determination by that agency. Finally, the defendants contend that since no valid federal claim is alleged, the state and common law claims should also be dismissed.

## STANDING OF INDIVIDUAL PLAINTIFFS

█ The appropriate question to begin with is the standing of the individual plaintiffs. Where a statutory claim is alleged, the starting point in resolving such a question is the language of the statute. *See, e. g., Reiter v. Sonotone Corp.*, 442 U.S. 330, 337, 99 S.Ct. 2326, 2330, 60 L.Ed.2d 931 (1979). Section 4 of the Clayton Anti-Trust Act provides that "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States . . . ." 15 U.S.C. § 15. For the purposes of this motion, the pertinent language is "injured in his business or property." Although the language itself provides few limitations, judicial interpretations have consistently required that a plaintiff allege an injury *directly* resulting from a violation in order to make out a claim under the antitrust laws. *Bookout v. Schine Chain Theatres, Inc.*, 253 F.2d 292, 294 (2d Cir. 1958). Neither shareholders, whether few or many, nor officers or directors of a corporation have a cause of action where the alleged antitrust violation interferes with and injures solely the business conducted by that corporation. *Bookout, supra; Mendenhall v. Fleming Co., Inc.*, 504 F.2d 879, 881 (5th Cir. 1974); *Martens v. Barrett*, 245 F.2d 844, 846 (5th Cir. 1957); *Gerli v. Silk Assoc. of America*, 36 F.2d 959 (2d Cir. 1929); *see also Vincel v. White Motor Corp.*, 521 F.2d 1113, 1119 (2d Cir. 1975). Such an interference would be a corporate injury for which the corporation may seek redress and not the individual shareholders and officers, even though they may be the principals of the corporation and suffer an adverse economic impact. Nor may a shareholder allege as an injury that he was required to sell his corporate stock at a depressed value because of an antitrust violation, for such a loss, though a real economic harm, is indirect and is duplicative of the corporation's claim. *Bookout, supra; Mendenhall, supra; Martens, supra.* Application of these principles requires an examination of the injuries alleged in plaintiffs' complaint.

█ After a review of the injuries itemized in plaintiffs' complaint, I find that none alleges a direct injury to the individual plaintiffs as required by the antitrust laws. First, the forced sale of the plaintiffs' "majority interests in Aprils Instrument Services, Inc., at a loss of approximately 25000 dollars," ¶ 14(J)(a), is an injury in the form of the diminution in the value of ownership, which is not a direct injury to the individuals. Second, the plaintiffs' allegations of "defendants' failure to allow [plaintiffs] office space in the terminal facility," ¶ 14(J)(c); of the defendants' interference with plaintiffs' right to contract for aviation fuel with Exxon, ¶ 24; and of the defendants' usurpation of a gasoline contract between Exxon and Batavia Aviation, ¶ 27, are all interferences and injuries which may be alleged only by the corporate and not the individual plaintiffs. Third, the loss of $10,000 in the sale of a plane trapped in a hangar due to the conspiratorial actions of the defendants, ¶ 20, is similarly an injury for which only one of the companies controlled by the plaintiffs may seek redress, as the complaint reads now; there is no factual allegation that one of the individual plaintiffs owned this airplane. Finally, without reaching whether an allegation that a party has been forced to incur attorneys' fees is an injury sufficient to support an antitrust action, plaintiffs' allegation that they have had to incur attorneys' fees in connection with this dispute is not recognizable because it would be the claim of the corporation in any case.

Therefore, the defendants' motion to dismiss this action insofar as it is maintained by the named individuals is granted.

*STATE ACTION EXEMPTION*

In a series of recent decisions, the Supreme Court has considered the extent to which the federal antitrust laws are applicable to anticompetitive conduct sanctioned in some way by state authority. *City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978); *Bates v. State Bar of Arizona,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977); *Cantor v. Detroit Edison Co.,* 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976); *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975). These decisions have construed the earlier decision of *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), in which the Supreme Court held that the antitrust laws were not intended to apply to state action. The *City of Lafayette* decision provides the most guidance in resolving whether the *Parker* doctrine of state action immunity insulates the defendants in this case.

In *City of Lafayette,* the Supreme Court determined that a city is not automatically entitled to the state action exemption by virtue of its status as a state governmental entity. Rather, the plurality opinion "conclude[d] that the *Parker* doctrine exempts only anticompetitive conduct engaged in as an act of government by the State as sovereign, or, by its subdivisions, *pursuant to state policy to displace competition with regulation or monopoly public service." City of Lafayette, supra,* 435 U.S. at 413, 98 S.Ct. at 1137 (emphasis supplied). Further explanation was provided in the plurality opinion. In order to assert a state action defense to an antitrust suit, a municipality would not necessarily have to "be able to point to a specific, detailed legislative authorization." But,

[w]hile a subordinate governmental unit's claim to *Parker* immunity is not as readily established as the same claim by a state government sued as such, we agree with the Court of Appeals that an adequate state mandate for anticompetitive activities of cities and other subordinate governmental units exists when it is found "from the authority given a governmental entity to operate in a particular area, that the legislature contemplated the kind of action complained of." 532 F.2d [431], at 434.

*Id.,* at 415.

Thus, a court must examine the state statute which purportedly contains the authorization for the anticompetitive conduct alleged. *See e.g., Kurek v. Pleasure Driveway and Park District of Peoria,* 557 F.2d 580, 590 (7th Cir. 1977), *remanded for reconsid.,* 435 U.S. 992, 98 S.Ct. 1642, 56 L.Ed.2d 81 (1978), *reinstated,* 583 F.2d 378 (7th Cir. 1978). The County and Prior point to Sections 350 and 352 of the New York General Municipal Law as providing the state authorization for their conduct necessary to invoke the state action exemption. The state legislature has authorized the local legislative body of a county to establish and operate an airport in § 350 of the General Municipal Law (McKinney's 1974). In § 352, the legislature has delineated the powers which the County may exercise as an airport owner. The subsection pertinent to this inquiry is § 352(5) which provides in relevant part that the County may:

Lease, or sub-lease the real property or lease, contract or otherwise agree, on an exclusive or non-exclusive basis, for the entire operation of such airport or landing field, or of any part thereof, or for the rendering of various services, or the conduct of business activities, on or at said airport or landing field subject to the provisions of section three hundred fifty-two-a of this chapter; provided, however, that no such lease or contract shall be made until the governing body of the municipality shall have held a public hearing in respect thereto on at least ten days notice published in two newspapers having general circulation in the municipality, and provided further that any lease of an entire or portion of an airport or landing field, together with the facilities thereon, or contract for the operation

of an airport or landing field or portion thereof shall be for a term not exceeding forty years and shall expressly provide that the said airport or landing field shall be used only for aviation purposes and for other purposes required for or necessary to the efficient and successful operation of an airport or landing field, upon such terms as shall require the operation of the same as a public airport or landing field for the general use of the public and for the benefit of such city, county, village or town.

Section 352(5) (McKinney's 1974). This subsection does authorize subdivisions of the state to enter into exclusive agreements for the operation of airports, for the rendering of various services or for the conduct of business activities at the airport. The terms of such agreements, however, must provide for the operation of the airport as a *public* airport for the *general use of the public.*

 The defendants have not convinced the court that the legislature "contemplated"[3] the action allegedly engaged in by the defendants, nor that the State of New York has manifested in § 352(5) a policy to displace competition with regulation or monopoly public service.[4] First, no state regulatory interest has been identified by the defendants, nor does it appear that the al-

leged actions of the County and Prior relate to any identifiable regulatory interest. *See City of Fairfax v. Fairfax Hospital Assoc.,* 598 F.2d 835 (4th Cir.), *on remand from* 435 U.S. 992, 98 S.Ct. 1642, 56 L.Ed.2d 81 (1978), *vacating,* for reconsideration in light of *City of Lafayette,* 562 F.2d 280 (4th Cir. 1977). Section 352 certainly reflects no essential state regulatory concern, and there is certainly no indication that the State is "actively supervising" any state policy as required by *California Retail Liquor Dealers Association v. Midcal Aluminum, Inc.,* 445 U.S. 97, 105, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980).[5]

Second, § 352 does not evince an unambiguous intent on the part of the state legislature to replace competition with monopolistic public service. Section 352 reveals that the state legislature believed that subordinate governmental units should have substantial leeway in determining how to operate their airports. This delegation of authority, as set out in § 352(5), permits a governmental entity such as Genesee County to enter into certain exclusive agreements and contracts in connection with the operation of, and the providing of services at, its airport. Such a delegation of authority is no doubt important to the way in which various governmental and proprietary functions are carried out in a state

---

**3.** "Contemplated" is not a precise word, but the Supreme Court was not explicit in defining the criteria to be employed in determining whether the challenged municipal activity came within the intent of the state legislature. Although specific articulation of legislative intent was not required to come within the *Parker* doctrine, the Court was not particularly expansive in its discussion of the level or type of legislative intent which would be required. For the instruction of the Fifth Circuit in *Lafayette, see* 532 F.2d 431, 434–35.

**4.** In *Goldfarb, supra,* the Supreme Court held that "[t]he threshold inquiry in determining if an anticompetitive activity is state action of the type the Sherman Act was not meant to proscribe is whether the activity is *required* by the State acting as sovereign." 421 U.S., at 790, 95 S.Ct. at 2015 (emphasis supplied). *See also Star Lines, Ltd. v. Puerto Rico Maritime Shipping Authority,* 451 F.Supp. 157, 166 (S.D.N.Y. 1978). This so-called compulsion test may be more appropriate to defendants who are pri-

vate parties rather than a municipality or state subdivision like the County, because there is usually some delegation of authority by the State to the municipality, however ambiguous. *See,* Note, *Antitrust Law—Municipal Immunity—Application of the State Action Doctrine to Municipalities,* 1979 Wis.L.Rev. 570, 590–92 (1979). It is apparent that the Supreme Court's approach and instruction in *City of Lafayette,* as set forth *supra,* is more appropriate in this case, given the status of the County.

**5.** The Court's most recent pronouncement in *California Retail Liquor* set forth two standards to be used in applying the *Parker* doctrine:

First, the challenged restraint must be "one clearly articulated and affirmatively expressed as state policy"; second, the policy must be "actively supervised" by the State itself.

*California Retail Liquor,* 445 U.S., at 97, 100 S.Ct., at 939.

system.[6] However, § 352(5) expresses on its face the concern and direction of the State that any agreement or contract entered into by the County be subject to the proviso that the airport be operated as a public airport for the general use of the public. With this express proviso, § 352(5) does not by itself show that the State contemplated anticompetitive conduct by a county like Genesee County. If anything, the subsection suggests that the State, after balancing the relevant factors, decided that its paramount concern was that the municipal airports of the State be open to use by the public and that it should limit a county's power to make exclusive agreements. Under these circumstances, antitrust scrutiny would appear proper and warranted. *Pinehurst Airlines, Inc. v. Resort Air Services, Inc.*, 476 F.Supp. 543 (M.D.N.C.1979).

In *Pinehurst Airlines*, the plaintiff alleged *inter alia* that a county board of commissioners, the county's airport committee, and a private corporation had violated the federal antitrust laws by giving that private corporation a monopoly at the county airport as the only fixed base operator and by conspiring to prevent the plaintiff from obtaining fixed base operator status or, at the least, from expanding its own operations at the airport. Motions similar to those in this case were brought by the defendants, and the court refused to dismiss the federal antitrust claim on the grounds of the *Parker* doctrine. In *Pinehurst*, the language of the statute authorizing the county to contract for the provision of various services was not as broad apparently as § 352(5). However, the court focused on the proviso in the North Carolina statute, analogous to the proviso in § 352, which guaranteed equal public use of the airport. *Id.*, at 554. The court was persuaded, as I am in this case, that one can infer from such language that the state intended that

substantial limits be placed on the County's authority to operate its airport, especially with regard to ensuring that the facilities of the airport be open to public use. *See also Woolen v. Surtran Taxicabs, Inc.*, 461 F.Supp. 1025, 1039 (N.D.Tex. 1978). Therefore, defendants' argument that the state legislature, in giving the County in § 352(5) the authority to operate an airport, contemplated the exclusive agreement and other anticompetitive conduct alleged in this case is not persuasive.

The defendants have relied on *E. W. Wiggins Airways, Inc. v. Massachusetts Port Authority*, 362 F.2d 52 (1st Cir.), *cert. denied*, 385 U.S. 947, 87 S.Ct. 320, 17 L.Ed.2d 226 (1966), to support their position. That decision, however, predated the recent Supreme Court cases of *Goldfarb*, *Bates*, and especially, *City of Lafayette*. The decision in *E. W. Wiggins* was based on the theory that a blanket *Parker* antitrust immunity applied to any governmental action. That is simply no longer the law.

Even if, after a reading of § 352(5), one were to find the language of that provision to be ambiguous as to the scope of the State's authorization, the defendants have provided no explanatory legislative history which would support their interpretation of the statute. Analysis of the legislative history behind a *state* statute is difficult under most circumstances. In this case, where the language which purportedly authorizes the conduct complained of is subject to a limiting proviso, the failure to provide supporting legislative history is not helpful.

█ As noted above, the defendant Prior also urges that the alleged activity of the defendants is not a violation of the antitrust laws. At least at this stage of the litigation, this argument must fail. The court must assume that Prior has an agree-

---

6. *See City of Lafayette, supra*, 435 U.S. at 418, 421–23, 98 S.Ct. at 1139, 1140–42 (Burger, C. J., concurring). Chief Justice Burger framed the issue as "whether the Sherman Act reaches the *proprietary* enterprises of municipalities," *id.*, at 422, 98 S.Ct. at 1141 (emphasis supplied), and would hold that it does. Focusing solely on the nature of the activity, that is,

whether it is governmental or proprietary, has some limitations as a tool of analysis. However, Burger's opinion is not unpersuasive insofar as it insists that a State, or municipality, be treated as any other antitrust defendant if it is engaged in an activity of a proprietary or business-type nature, rather than of a regulatory governmental nature.

ment with the County by which it (1) has become the exclusive fixed base operator at the airport, able to allocate and price space at the facility as it wishes, and (2) has obtained the exclusive right to use the airport facilities as an air carrier. There is a tremendous potential for anticompetitive abuse with such an arrangement, *see Pinehurst Airlines, supra,* at 553, and plaintiffs' complaint alleges such abuses. Prior's argument that an exclusive lease arrangement with a governmental agency is not an antitrust violation is based largely on the *E. W. Wiggins* opinion, already distinguished by the court. The court notes as well that a conspiracy to eliminate competition in obtaining an exclusive contract may indeed be an antitrust violation. *See United States v. Yellow Cab Co.,* 332 U.S. 218, 229, 67 S.Ct. 1560, 1566, 91 L.Ed. 2010 (1947). Although the facts in *Yellow Cab* are somewhat different from those revealed so far in this case, the allegations of conspiracy in plaintiffs' complaint raise the question of whether defendants have entered into an agreement with the knowledge and intent that competition be restricted at the airport, especially since, at least in their memorandum of law, plaintiffs question the competitive nature of the bidding process which resulted in Prior's contract. At least at this stage in the litigation, defendants have not shown plaintiffs' failure to state a claim under the antitrust laws.

To conclude, the connection between the legislative grant of authority to the County in § 352 and its alleged use in this case is simply too tenuous to conclude that the County's actions were within the intended scope of activity authorized by the State of New York.[7] Prior, as a private non-governmental party, has a different status than the County. However, if the County itself cannot claim to be "exempt" from the antitrust laws by virtue of its status, then *a fortiori* Prior has no greater claim to the state action exemption in this case, especially since it is alleged that Prior and the County have acted in concert to prevent plaintiffs from competing with Prior or, in other words, have engaged in the same activity. Therefore, defendants' motion to dismiss plaintiffs' antitrust claim is denied.

## FEDERAL AVIATION ACT CLAIM

This aspect of the defendants' motions to dismiss requires the court to determine whether a private cause of action may be implied under § 308 of the Federal Aviation Act, 49 U.S.C. § 1349(a). That section provides in relevant part that "[t]here shall be no exclusive right for the use of any landing area or air navigation facility upon which Federal funds have been expended." The plaintiffs contend that this provision has been violated and that they have a private remedy under its terms.[8]

As in the area of the *Parker* state action exemption, the Supreme Court has recently issued a number of decisions which set forth the factors to be considered in deciding whether a private remedy should be implied when the statute is silent as to whether or not one exists. *See, e. g., Touche Ross & Co. v. Redington,* 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979); *Cannon v. University of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979); *Piper v. Chris-Craft Industries, Inc.,* 430 U.S. 462, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977); *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). These decisions emphasize that "the fact that a federal

7. The very recent case of *California Retail Liquor, supra,* n.5, in no way changes my decision. If anything, it indicates a continuing trend of the Supreme Court to apply the *Parker* doctrine narrowly and, although no state subdivision was involved in that case, it reinforces my decision in this case that there should be no finding of antitrust immunity.

8. It is not entirely clear from plaintiffs' complaint whether plaintiffs seek only injunctive relief for the alleged violation of § 1349(a), or damages as well. A review of 49 U.S.C. § 1487, the section which authorizes the government and, in a very limited situation, a private party, to seek enforcement of the Federal Aviation Act, suggests that only injunctive relief would be obtainable by the plaintiffs, assuming *arguendo* that a private remedy exists for a violation of 49 U.S.C. § 1349(a). A court appears authorized under § 1487 to direct only injunctive relief, and there is no mention of damages at all.

statute has been violated and some person harmed does not automatically give rise to a private cause of action in favor of that person." *Cannon, supra*, 441 U.S. at 688, 99 S.Ct. at 1953. Rather, whether a private remedy should be implied is a matter of statutory construction and the principal inquiry is "whether Congress intended to create the private right of action asserted." *Touche Ross, supra*, 442 U.S. at 568, 575, 99 S.Ct. at 2485; *Cannon, supra*, at 688, 99 S.Ct. at 1953. My review of the factors to be weighed by the court, as set forth in *Cort, supra*, indicates that no private cause of action exists under 49 U.S.C. § 1349(a).

First, there is no indication that this statutory provision was enacted for the benefit of a special class of which the plaintiffs are members, which is the threshold question under *Cort. Cannon, supra*, at 689, 99 S.Ct. at 1953. In contrast to the cases in which the courts have implied a cause of action where none was expressly provided by statute, the language of § 1349(a) does not explicitly confer a special benefit on a class of persons in plaintiffs' position. *Compare* the language of § 1349(a) *with*, for example, the statutory provision at issue in *Cannon, supra* (§ 901(a) of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681) and in *Allen v. State Board of Elections*, 393 U.S. 544, 554–55, 89 S.Ct. 817, 825–26, 22 L.Ed.2d 1 (1969) (§ 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c). In each of those contexts, Congress identified the class which it intended to benefit by the enactment of a law creating federal rights. Section 1349(a) however, is more in the nature of a law for the protection of the general public, a provision which is part of a statutory scheme to monitor how federal funds are spent. Although § 1349 does prohibit exclusive rights to the use of airfields upon which federal monies have been spent, this does not constitute as compelling a reason to infer a private remedy as where a class of persons has been granted certain rights by statute. *Cannon, supra*, 441 U.S. at 690–94, 99 S.Ct. at 1954–56.

Second, the court has been shown no legislative history evidencing any purpose to provide a private cause of action. Although, typically, there will not be a significant amount of legislative history where the statute does not expressly create or deny a private remedy, *id.*, supra, at 694, 99 S.Ct. at 1956, the plaintiffs' position is not helped by their failure. *Compare, id.*, at 694–703, 99 S.Ct. at 1956–61, in which the Supreme Court analyzed in great detail the legislative history supporting implication of a private remedy in that case. Moreover, the statutory scheme of the FAA, of which § 1349(a) is a part, reveals that Congress did create a provision by which an aggrieved private party can obtain injunctive relief against a violation of § 401(a) of the FAA, 49 U.S.C. § 1371(a), which precludes air carriers from engaging in air transportation without certification. *See* 49 U.S.C. § 1487. Thus, Congress certainly knew how to provide a private remedy when it wished to do so. *Touche Ross, supra*, 442 U.S. at 571–72, 99 S.Ct. at 2486–87. Given as well the extensive government enforcement scheme, the court should be slow to expand the private enforcement remedies beyond what Congress authorized. *National Railroad Passenger Corp. v. National Association of Railroad Passengers*, 414 U.S. 453, 458, 94 S.Ct. 690, 693, 38 L.Ed.2d 646 (1974); *Viking Travel, Inc. v. Air France*, 462 F.Supp. 28, 37 (E.D.N.Y.1978).

Where these first two factors strongly point to the lack of any Congressional intent to create a private remedy, the Supreme Court has recently suggested that the remaining two factors of the *Cort v. Ash* analysis have little relevance to whether a court should imply such a remedy. *Touche Ross, supra*, 442 U.S. at 575, 99 S.Ct. at 2489. Although I believe the third *Cort* factor, whether a private remedy is necessary "to effectuate the purpose of the section," *Cort, supra*, 422 U.S. at 78, 95 S.Ct. at 2087, should continue to be an important inquiry in such situations, the court is not persuaded in this case that implication of a private remedy is mandated in any way by the purpose of § 1349(a). A reading of § 1349(a) in its entirety reveals that this section concerns the expenditure of federal

funds on landing areas and the FAA's responsibilities in determining that such landing facilities are necessary for use in commerce or in the interests of national defense. While the section also directs that no exclusive rights to use these landing areas be granted, there is no strong remedial purpose reflected in § 1349(a) analogous to, for example, enforcement of Title IX in *Cannon*. There is as well an extensive government enforcement scheme, *see* 49 U.S.C. § 1487, and under all these circumstances there is not any compelling need for the court to imply a remedy in this case.

Finally, the court takes note of two cases. First, the plaintiffs rely heavily on *Niswonger v. American Aviation, Inc.*, 411 F.Supp. 763 (E.D.Tenn.1975), *aff'd without op.*, 529 F.2d 526 (6th Cir. 1976), a case in which the district court did find a private remedy under § 1349(a). The relevant portion of that case, however, pre-dates *Cort v. Ash* and the more recent Supreme Court decisions as to when private remedies should be implied. It is clear that the *Niswonger* court did not consider whether Congress intended to provide a private remedy and the persuasiveness of *Niswonger*, therefore, is necessarily discounted. *See Viking Travel, supra,* at 35. A second case should be noted briefly. The Supreme Court has recently vacated the judgment of the United States Court of Appeals for the Seventh Circuit in *Bratton v. Shiffrin*, 585 F.2d 223 (1978), in which the Seventh Circuit had found that a private right of action should be implied under § 401(n)(2) of the Federal Aviation Act, 49 U.S.C. § 1371(n)(2). *Shiffrin v. Bratton*, 443 U.S. 903, 99 S.Ct. 3094, 61 L.Ed.2d 871 (1979). The Supreme Court remanded the case for reconsideration in light of *Touche Ross, supra.* Although § 1371(n)(2) is not similar in purpose to § 1349(a), the Supreme Court's remand emphasizes that its approach in *Touche Ross* should be given careful consideration in deciding whether a private remedy should be implied under the FAA, as this court has attempted to do.

Based upon the above reasons, I find that no private remedy exists under 49 U.S.C. § 1349(a) and that defendants' motion to dismiss plaintiffs' claim under that section should be granted. Because of this decision the court will not reach the question of whether the doctrine of primary jurisdiction should apply in this case, as argued by the defendants.

*CONCLUSION*

The court resolves the motions to dismiss as follows:

(1) defendants' motion to dismiss the plaintiffs' claims insofar as they are brought by the individual plaintiffs, Will S. Guthrie, Walter C. Guthrie, and Walter C. Guthrie, Jr., is granted;

(2) defendants' motion to dismiss the plaintiffs' Sherman Act claims is denied; and

(3) defendants' motion to dismiss the plaintiffs' claim under the Federal Aviation Act is granted.

SO ORDERED.