William M. FREEMAN,
Plaintiff–Appellee,

v.

Richard A. MAYER and Spangler,
Jennings & Dougherty, P.C.,
Defendants–Appellants.

No. 95–3425.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 22, 1996.

Decided Sept. 6, 1996.

Rehearing and Suggestion for Rehearing
En Banc Denied
Oct. 2, 1996.

J. Michael Trueblood (argued), Bruce W. Graham, Trueblood & Graham, LaFayette, IN, for plaintiff–appellee.

Peter G. Koransky, Robert D. Brown (argued), Richard A. Mayer, Spangler, Jennings & Dougherty, Merrillville, IN, for defendants–appellants.

Before CUMMINGS, EASTERBROOK, and DIANE P. WOOD, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

Fee-sharing arrangements between lawyers are regulated in Indiana under Rule 1.5(e) of the Rules of Professional Conduct promulgated by the Indiana Supreme Court. In this case, we must decide whether such a fee-sharing agreement existed between William M. Freeman, at the relevant time an Illinois lawyer, and Richard A. Mayer, an Indiana lawyer and his law firm, Spangler, Jennings & Dougherty, P.C. (For convenience, we refer to both as Mayer, unless the context requires otherwise.) Because we conclude, like the district court, that a contract arose between Freeman and Mayer, we must also decide whether Mayer has any legally cognizable defense to its enforcement based on its alleged incompatibility with the Rules of Professional Conduct. In the circumstances of this case, we find that Mayer has no standing to raise a defense based on the Rules, and we therefore find that the district court correctly enforced the agreement between the parties.

## I

On December 21, 1988, Kirk Weidenaar was badly injured in an accident at an Amoco Oil Company warehouse in Hammond, Indiana, which left him a quadriplegic. Shortly thereafter, Marion and Linda Morgan, Kirk's in-laws, contacted William M. Freeman, an Illinois attorney who was a friend of the family, for advice and assistance. Freeman immediately went to the site of the accident, along with Marion Morgan and a private investigator, to gather information and to take some photographs. On February 7, 1989, Dawn Weidenaar (on behalf of herself and Kirk) signed a written retainer agreement in Lansing, Illinois, engaging Freeman as their attorney to pursue any claims they might have in conjunction with Kirk's accident. The agreement provided for a standard one-third contingent fee from "whatever sum may be collected by suit, settlement or otherwise."

Freeman referred Kirk's potential workman's compensation claim to an Indiana lawyer, Ron Layer, who took over that part of the case. Otherwise, Freeman himself handled all matters for the next twenty months. This work involved liability investigation, research, medical documentation, and personal conferences with the Weidenaars, both at his Lansing, Illinois office and in their Indiana home. Freeman himself was not admitted to practice in Indiana, although he had handled Indiana cases before on a *pro hac vice* basis. Because of that fact, and because he was preparing to retire to North Carolina, he decided that he should associate with an Indiana attorney for the day-to-day handling of the case, including trial preparation and trial if necessary. After one false start, he met on September 24, 1990, with Richard A. Mayer, of the law firm Spangler, Jennings & Dougherty, P.C., in Merrillville, Indiana. At that meeting, Freeman explained the essentials of the case to Mayer and told Mayer that he needed an Indiana lawyer. At this meeting, Freeman asked whether Mayer would agree to share the attorney's fees on a fifty-fifty basis, in lieu of a one-third referral fee. Freeman claims that Mayer agreed, but the parties disagree about many details of this meeting: did Freeman state that he would refer the case only if Mayer agreed to the fifty-fifty split? did Mayer agree to this division of fees only on the condition that Freeman's work would be substantially equal to his own? did Freeman tell Mayer he was moving permanently to North Carolina? Whatever the answers to these questions, subsequent dealings between the two clarified the nature of their association.

Immediately after his meeting with Mayer, Freeman met with the Weidenaars and recommended that they accept Mayer as their Indiana counsel. He told them that he would split any fees with Mayer fifty-fifty and that his agreement with Mayer would not affect

their potential judgment. In their affidavits filed in the present action, both Dawn and Kirk Weidenaar confirmed that Freeman had fully disclosed the fee-sharing arrangement to them and that they had consented both to his association with Mayer and to the fee arrangement. Neither at that time, nor at any other time in the action, did the Weidenaars sign any written retainer agreement directly with Mayer.

On October 11, 1990, Freeman wrote the first letter to Mayer that is claimed to form the basis of the written agreement between himself and Mayer. The October 11 letter stated, in pertinent part:

> You [Mayer] and I have agreed that your firm and I will share the fees and costs advanced (e.g., experts, court reporters, photographs, filing fees, etc.) on an equal basis. These costs will be reimbursed to use by the clients if and when there is a recovery and will be paid from their share of any judgment or settlement.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> Please drop me a line [noting new North Carolina address] acknowledging receipt of this letter and indicating whether or not I have accurately set forth our agreement.

As requested, Mayer responded with a letter dated October 25, 1990, which read as follows:

> I received your letter, and enclosed herewith is a suggested Attorney/Client Agreement which is self-explanatory. Please feel free to change it in any way you see fit. When you come here on October 31, 1990, we can meet and talk further. I will try to get some preliminary information by then. I look forward to working with you on this matter. Thank you kindly.

(We note, for the record, that Mayer's brief contains a substantial amount of argumentative material about the legal effect of this second letter in the "Statement of Fact" section of the brief, in violation of Circuit Rule 28(d)(1). We cannot stress enough how important it is, for clear presentation of both the facts and legal arguments to the court, to refrain from this practice.)

As it happened, Freeman did not come for an October 31 meeting, but he did write another letter dated November 6, 1990, in which he apologized for not coming and for the disorganized state of the file. He encouraged Mayer to arrange a visit with the Weidenaars and asked him to file the complaint promptly. Finally, he wrote "I enclose a copy of my existing attorney-client contract. I prefer not to bother them at present with the matter of a new contract and trust that this plus my letter to you of 10/1/19 will suffice for the moment."

On December 17, 1990, Mayer filed a complaint on behalf of the Weidenaars against AMOCO and NIPSCO. Freeman's name also appeared on the complaint; the parties dispute whether Freeman had asked Mayer to arrange for his *pro hac vice* admission or not, but it appears to be undisputed that the inclusion of Freeman's name without the necessary motion was a mistake that occurred in Mayer's office. Mayer sent a copy of the complaint to Freeman the same day, reported that "everything is just fine," and wished him a happy holiday. Mayer then began devoting considerable effort to the case. He and other attorneys at his firm conducted 38 depositions, reviewed records from 72 non-parties, prepared further pleadings and motions, and appeared at all pre-trial conferences, court hearings, and court-ordered mediation sessions. All told, the Spangler firm advanced some $41,317 in costs. Finally, they conducted a full jury trial. Following the trial, the jury returned a verdict in favor of Kirk Weidenaar in the amount of $7,000,000 and in favor of Dawn Weidenaar for $1,000,000, and it assessed Kirk's comparative fault at 40 percent.

Freeman took no part in any of this work, but it also appears that Mayer did not inform him of key times such as when depositions would be taken and that Mayer was not keeping Freeman's file up-to-date. Nevertheless, Freeman was continuing to consult with the Weidenaars. He attended the trial with Dawn Weidenaar and was recognized by the presiding judge as counsel of record based on what appeared in the original complaint.

Following the judgment, Mayer and the Spangler firm negotiated a final settlement on behalf of the Weidenaars in the amount of

$4,725,581, and the firm assisted the couple with the financial planning in connection with their settlement. From the total amount, the Spangler firm was reimbursed the full $41,317.75 it had advanced as costs. It then received one-third of the remaining $4,684,263, or $1,561,421 as its attorneys' fees—the percentage that had been specified in the Weidenaars' original agreement with Freeman. Half that amount would have been $780,710. Freeman, however, only learned of the settlement in early January 1993, when Dawn Weidenaar mentioned it to him. He called Mayer to find out what was happening, and Mayer essentially told him the check was in the mail. When Freeman actually received the check on February 1, 1993, however, he was dismayed to learn that Mayer had sent only $520,473, which was just one-third of the net attorneys' fee award after deduction of the $41,317 in costs. Freeman objected immediately and did not negotiate the check. Eventually, Mayer stopped payment on it, claiming that the alleged fee-sharing agreement with Freeman violated the Indiana Rules of Professional Conduct.

## II

This diversity suit in federal court followed more than a year and a half later. Freeman sued, claiming that Mayer and his firm had breached the fee-sharing agreement that arose by virtue of the fall 1990 correspondence and the course of dealing between the parties. The district court granted summary judgment for Freeman on September 19, 1995. The primary issue in the district court's view was whether a contract existed between Freeman and Mayer (and his firm) regarding any attorney's fees that might be collected in the Weidenaars' case. The court concluded that Freeman's October 11 letter was an offer for the referral to be made on the basis of an even split of the fees, and that Mayer accepted both through his return correspondence and his course of dealings. The court ordered Mayer to remit $780,810.54 to Freeman. In response to Freeman's Rule 59(e) motion, seeking to amend the judgment to include pre-judgment interest, the court noted that $520,473.69 of the disputed sum had been in an interest-bearing escrow ac-count since October 1994, and that this was enough pre-judgment interest. The court also stayed execution of the judgment, on the condition that Mayer pay the additional $260,336.85 into the escrow account.

## III

There are only two issues on appeal, once we clear away the rhetoric that has clouded much of the case. First, we review *de novo* the district court's conclusion that the undisputed facts showed that a fee-sharing contract arose under Indiana law, because this case comes to us from a summary judgment. Second, we consider whether any of the arguments relying on the Indiana Rules of Professional Conduct that Mayer and his firm have put forward to avoid the consequences of a contract have the effect the defendants claim they do.

### A.

Like the district court, we have little trouble concluding that a contract arose between Freeman and Mayer by virtue of the letter of October 11, Mayer's responses of October 25 and December 17, and, perhaps most importantly, Mayer's course of dealing. The terms of the contract were straightforward: Freeman would refer his clients, the Wiedenaars, to Mayer for whatever litigation might be necessary in Indiana, and he would turn over the files on the case that he had compiled over nearly a two-year period. In return, he would receive one-half of whatever attorney's fees were eventually recovered. (The parties dispute the extent to which the agreement contemplated Freeman's rendering additional services, although we note that Mayer was using Freeman's North Carolina address as early as the October 25, 1990, letter. Mayer also does not dispute that Freeman maintained his relationship with the clients during the time the lawsuit was in litigation.)

Even the early Indiana cases on which Mayer relies make it clear that a contract can arise by correspondence. See *Cal Hirsch & Sons Iron & Rail Co. v. Peru Steel Casting Co.*, 50 Ind.App. 59, 96 N.E.

807, 810–11 (1911); *Corydon Milling Co. v. Noblesville Milling Co.,* 69 Ind.App. 491, 122 N.E. 362, 364 (1919); *Ismert–Hincke Milling Co. v. Burkhart,* 82 Ind.App. 414, 146 N.E. 334, 334 (1925). Not surprisingly, the law has not changed in that regard over the course of this century, although the courts have become more willing to look to the overall intention of the parties to enter into an agreement and to infer terms that may not appear on the face of the writings. See, *e.g., Suyemasa v. Myers,* 420 N.E.2d 1334, 1345 (Ind.App.1981) (letter and response constituted a valid contract; "[a]lthough the terms of the contract do not specify the time and place of performance, this fact does not make the contract fatally defective, for the law will imply those terms"). See also *Jay Clutter Custom Digging v. English,* 181 Ind. App. 603, 393 N.E.2d 230, 232 (1979); RESTATEMENT (SECOND) OF CONTRACTS § 204 (1981). The rule is simple: "[t]o form a contract, one party must extend an offer, and the other party must communicate acceptance of the offer to the offeror." *Rosi v. Business Furniture Corp.,* 615 N.E.2d 431, 435 (Ind.1993), citing *Bain v. Board of Trustees of Starke Memorial Hosp.,* 550 N.E.2d 106, 110 (Ind.Ct.App.1990).

In this case, Freeman extended the offer in writing in his October 11 letter, which referred to the earlier meeting of September 24 between the two lawyers. The handwritten October 11 letter covered all the important points of the fee-sharing arrangement: who the clients were (the Weidenaars), what case was involved (prosecution of claims for personal injuries and loss of consortium against NIPSCO and AMOCO), basic facts about the accident, and the details of the fee-sharing agreement, set forth in the excerpt from the letter quoted above. Freeman noted that he had already expended a considerable amount of time in the matter. He clearly stated that he might assist or consult "to a greater or lesser extent in the future," but that "in any event the primary responsibility for the handling of the case will be yours." He noted that he had informed the clients of the arrangement and that they had approved it. He asked Mayer to send along the usual and customary fee contract for use in Lake County, Indiana, and he promised to obtain the Weidenaars' signature. He closed with some details, including an invitation to Mayer to contact the Weidenaars directly if he wished, and a request for confirmation about the terms of their agreement.

Mayer's response gave no indication whatsoever that Freeman had inaccurately represented the terms to which the two had agreed orally in September. To the contrary, Mayer enclosed the requested Attorney–Client agreement and indicated that he would begin working on preliminary information. In context, the Attorney–Client agreement was plainly for Freeman to send along to the Weidenaars. Thereafter, the parties began a course of dealing that can be understood only in terms of the contract as described in Freeman's October 11 letter. Freeman suggested in the November 6 letter that they could dispense with the signing of the new Attorney–Client contract and that his own agreement with the Weidenaars, supplemented by the two letters, would be enough. Mayer did nothing to indicate disagreement with the arrangement; instead, he forged ahead, meeting with the clients, working on the complaint, and filing suit on December 17, 1990. He then, along with others in his firm, worked hard on the case for more than two years and brought it to a very successful conclusion—strange behavior for a lawyer who did not even have a signed retainer agreement with the client, unless, as Freeman had suggested in the November 6 letter, the Weidenaar–Freeman contract plus the two letters served as Mayer's own contract. Along the way, on August 27, 1992, the Spangler firm sent an itemized bill of costs incurred to that point on the Weidenaar file, which totaled $5,294.57. It requested half that amount from Freeman, $2,647.28. It is hard to imagine where the 50 percent figure came from, if not the original agreement between the parties about splitting fees and costs equally.

■ Indiana, like most other states, allows parties to prove that a contract came into existence using evidence of the course of dealings between the parties. See, *e.g., Indiana Farm Bureau Cooperative Ass'n, Inc. v. Ennis,* 574 N.E.2d 322, 323 (Ind.Ct. App.1991); *Moridge Mfg. Co. v. Butler,* 451

N.E.2d 677, 680 (Ind.Ct.App.1983). Nothing offered in opposition to Freeman's motion for summary judgment refutes the evidence of a contract demonstrated by the undisputed facts.

### B.

The question therefore becomes whether Mayer has offered any reason why the district court should have refused to enforce the contract between Freeman and himself (with his firm) regarding the Weidenaar case. He makes two arguments: first, he makes the astonishing assertion that Indiana lawyers cannot agree to share fees with lawyers admitted in other jurisdictions but not in Indiana, and second, he argues that this particular fee agreement should be declared unenforceable because it does not comply with Indiana Rule of Professional Conduct 1.5(e).

As a federal court sitting in diversity, it is our duty to apply Indiana law as it is authoritatively declared by the Indiana courts and legislature. We have often noted in the past that the federal courts are not the best place to turn for novel applications of state law, because we must accept the law as it exists at present; those looking for innovations would be better advised to bring their claims in the state courts. From that perspective, we begin by observing that nothing in the Indiana Rules of Professional Conduct even hints at the radical notion that the Indiana Supreme Court set out to destroy the interstate practice of law through its Rules of Professional Conduct. Quite to the contrary, the Indiana rules make provision for appearances of members of the bar of other states, territories, or the District of Columbia, so long as the lawyer appears with local counsel. Indiana State Admission and Discipline Rule 3. Unless the court meant to restrict Rule 3 admissions to cases where the "foreign" lawyer was appearing *gratis*, the only way to make this system work is to have some kind of fee-sharing arrangement between the Indiana lawyer and the out-of-state lawyer. Other Indiana rules of professional conduct also extend courtesies, in one way or another, to out-of-state lawyers. See, *e.g.*, Indiana State Admission and Disciplinary Rule 6, § 1 (allowing for admission of out-of-state lawyers to the Indiana Bar provided that the lawyer "has actively engaged in the practice of law for a period of at least five (5) of the seven (7) years immediately preceding the date of application."). See also Indiana State Admission and Disciplinary Rule 5, § 1 (allowing attorneys from foreign nations to, at the discretion of the Supreme Court, practice in Indiana as a foreign legal consultant). We therefore reject out of hand the argument that the Freeman–Mayer agreement was objectionable merely because it involved an Illinois lawyer and an Indiana lawyer.

The question with respect to Rule 1.5(e) is more interesting, but ultimately unavailing for Mayer as well. Rule 1.5(e) specifically addresses fee-sharing agreements between lawyers:

(e) A division of fee between lawyers who are not in the same firm may be made only if:

(1) the division is in proportion to the services performed by each lawyer or, by written agreement with the client, each lawyer assumes joint responsibility for the representation;

(2) the client is advised of and does not object to the participation of all the lawyers involved; and

(3) the total fee is reasonable.

Mayer argues that the fact that there was no written agreement with the Weidenaars in which each lawyer assumed joint responsibility for their representation means that the entire agreement is void as against public policy, and that he therefore gets a windfall in the amount of $260,336.85. This is so, he claims, because the Indiana Rules of Professional Conduct have the "force of law."

We agree that the agreement between Freeman and Mayer may not have followed the letter of Rule 1.5(e), but we disagree with Mayer that the consequences of this failure are so favorable to him. (It is not entirely clear that it failed the Rule 1.5(e) test, because the facts might have shown that the work Freeman put in between the time of the accident and the time of the referral, plus the minor work he did while Mayer was handling the litigation, was roughly the same as Mayer's work, and thus the division may

have satisfied the proportionality test of Rule 1.5(e)(1), clause one. However, this is certainly a disputed issue of fact, and we therefore assume for the sake of argument that the fifty-fifty division was not "proportional.") Here, the Weidenaars were advised of the arrangement and did not object, and neither party here is claiming that the fee was unreasonable. The problem therefore boils down to Rule 1.5(e)(1), clause two: what happens when there is a non-proportional division of fees, and there is no written agreement with the client?

■ Mayer claims that all violations of Rule 1.5(e) automatically make the contract void as against public policy, but this position disregards substantial Indiana law making it clear that there is a distinction between contracts that may be illegal in Indiana and those that must be declared void and unenforceable. In *Kaszuba v. Zientara,* 506 N.E.2d 1 (Ind.1987), the Indiana Supreme Court held that an agreement between two Indiana residents to purchase an Illinois lottery ticket was enforceable, notwithstanding the fact that the contract violated Indiana's law at the time against gambling. The basic activity was legal where the contract was to be performed, and that was enough. *Id.* at 3. More generally, the Indiana courts reserve the public policy trump card only for arrangements that fundamentally contravene state law. See *Schornick v. Butler,* 205 Ind. 304, 185 N.E. 111, 112–13 (1933).

■ Mayer has problems at several levels with this argument. First, under the undisputed facts of this case, the clients agreed to the joint representation and worked with both lawyers. Thus, while there may have been a technical violation of the rule, it was no more than that, and the clients, for whose benefit the rule exists, were fully protected. Second, apart from the agreement with Freeman, Mayer himself had no fee agreement with the clients, yet Rule 1.5(c) requires a contingent fee agreement to be in writing. Taking his strict approach to the matter, one could argue that the only lawyer entitled to collect fees under Indiana's rules was Freeman, not Mayer—an argument, we hasten to add, that we are not endorsing, because we have found the fee-sharing agreement to exist and to satisfy the "writing" requirement here. (Mayer has not argued that he is entitled to any particular amount of Freeman's fees on a *quantum meruit* basis, which would be the only way he could recover anything in the absence of his own written agreement with the clients.) Third, it is not clear that Indiana would confer standing on the lawyer to bring a suit to nullify a fee-sharing agreement that violated Rule 1.5(e)(1), since the lawyer-parties to the agreement do not appear to have interests that are legally protected by this rule. *Cf. Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136–37, 119 L.Ed.2d 351 (1992) (summarizing requirements for standing in federal courts).

■ We find little help in Mayer's insistence that the Indiana Rules of Professional Conduct have the "force of law." We would have no reason to treat them otherwise. *Cf. Baer v. First Options of Chicago, Inc.,* 72 F.3d 1294 (7th Cir.1995). The question here is what law did the Indiana court adopt? Like the Indiana Court of Appeals in the now-vacated opinion in *Trotter v. Nelson,* 657 N.E.2d 426 (Ind.Ct.App.1995), *transfer granted,* April 24, 1996, we find the preamble to the Rules instructive in this regard. There the Indiana Supreme Court stated:

Violation of a Rule should not give rise to a cause of action nor should it create any presumption that a legal duty has been breached. The Rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies. They are not designed to be a basis for civil liability, but reference to these rules as evidence of the applicable standard of care is not prohibited. Furthermore, the purpose of the Rules can be subverted when they are invoked by opposing parties as procedural weapons. The fact that a rule is a just basis for a [lawyer's] self-assessment, or for sanctioning a lawyer under the administration of a disciplinary authority, does not imply that an antagonist in a collateral proceeding or transaction has standing to seek enforcement of the Rule. Ind. Rules of Prof. Conduct, Preamble, Scope.

In other words, the Indiana Supreme Court both indicated what rules of conduct it deemed appropriate for lawyers admitted to practice before it, and what force those rules were to have in ancillary matters. As some-

thing designed to provide "guidance," but not to be a basis for civil liability, our best prediction is that the Indiana Supreme Court would not permit one of its attorneys to invoke Rule 1.5(e) as a shield against living up to a substantively unobjectionable contractual arrangement with an out-of-state lawyer.

It would be unfortunate indeed for our economy, which is no longer "merely" national but increasingly international, to strain to interpret the Indiana Rules of Professional Conduct in a way that would discourage lawyers from affiliating with local counsel and clients from seeking out the lawyer of their choice, no matter what state the lawyer may be licensed in. Freeman did nothing unusual: he took a case for old friends, he associated himself with local counsel when it appeared that court proceedings in another jurisdiction would be required, and he reduced his agreement both with his client and his co-counsel to writing. Mayer, it appears, simply had second thoughts when the case came out favorably and tried to improve the terms of his arrangement with Freeman *ex post*. Nothing in the Indiana Rules of Professional Conduct either required or permitted this behavior. We accordingly AFFIRM the judgment of the district court.