# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-2426

_____

Patrick J. Eng; Matthew B. Woods;    *
Douglas F. Pugh; Thad R. Mulholland;   *
Jonathan D. McQuilkin,    *
   *
       Appellees,    *
   *   Appeal from the United States
     v.    *   District Court for the
   *   Western District of Missouri.
Cummings, McClorey, Davis & Acho,   *
PLC,    *
   *
       Appellant.    *

_____

Submitted: February 9, 2010
Filed: July 9, 2010

_____

Before RILEY, Chief Judge,[1] SMITH and SHEPHERD, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

Patrick Eng, individually and on behalf of his partners in the Missouri law firm of Eng & Woods (collectively "Eng & Woods"), filed a declaratory judgment action against Cummings, McClorey, Davis & Acho, PLC ("CMDA"), a Michigan law firm, seeking a judgment that Eng & Woods need not share a portion of the attorney's fees

_____

[1]The Honorable William Jay Riley became Chief Judge of the United States Court of Appeals for the Eighth Circuit on April 1, 2010.

awarded to the firm in a personal injury action. CMDA cross-claimed to recover one-third of the fee award. The district court[2] granted summary judgment in favor of Eng & Woods. We affirm.

I.

We recite the facts in the light most favorable to CMDA. See Dovenmuehler v. St. Cloud Hosp., 509 F.3d 435, 437 (8th Cir. 2007). In November 2006, Ernie Fazio, a long-time client of CMDA attorney James Acho, called Acho to inform him that Fazio's sister-in-law, Beverly Townsend, and her husband, Douglas Townsend, had been killed in a motor vehicle accident in Missouri. The purpose of Fazio's call was to ensure that CMDA would represent two of Beverly's children, Michael Richina and Khemya MitRahina, in any lawsuit arising from the accident. Fazio indicated that he had a close relationship with Richina and asked Acho to take care of him.

Acho spoke with Richina the following day, who indicated that he wanted CMDA to handle any suit arising from the accident. Richina agreed that CMDA would either pursue the lawsuit in Missouri or refer the case to a Missouri law firm, although Richina never signed a representation agreement with CMDA. Acho decided that CMDA would not try the case itself and began researching Missouri firms to refer the case to, eventually settling on Eng & Woods. Acho called Patrick Eng, a founding partner at Eng & Woods, and the two agreed that Eng & Woods would handle the case. According to Acho, Eng also agreed that CMDA would retain one-third of the fees that Eng & Woods garnered from the case, a fact that Eng & Woods vigorously disputes. Acho put Eng in touch with Richina and, on November 16, 2006, both Richina and MitRahina entered into contingent fee contracts with Eng & Woods. In the contracts, Eng & Woods agreed to represent Richina and MitRahina in any case

___

[2]The Honorable Nanette K. Laughrey, United States District Judge for the Western District of Missouri.

-2-

arising out of the death of their mother, in exchange for one-third of all sums recovered. Neither contract made any mention of any agreement with Acho or CMDA.

On December 1, 2006, Acho sent a letter to Eng purporting to memorialize the alleged agreement they had made. It stated:

> This letter will serve as a follow-up to our phone conversations of the past two weeks. First, please accept my sincere thanks for agreeing to take on this tragic case. Anytime individuals lose their lives, a case takes on more significance and it makes us fight just that much harder. Your client, Mike [Richina], was referred to me by his uncle, Ernie Fazio, who has been my client for several years. I in turn contacted you via the recommendation of my father, Ronald Acho, who holds you in high regard.
>
> As we agreed on the phone, this firm will retain a one-third (33 1/3%) consulting fee against any recovery Eng & Woods garners on behalf of Mike [Richina], or any other party the firm represents as a result of the action. We understand, of course, that the fee is after your actual costs. I will work with you on the case as liaison, keeping in constant communication with Ernie Fazio, and when necessary, Mike [Richina]. I will also be on call at any time for you or your partner, should you need any assistance.
>
> If you have any questions or concerns, or if this is not an accurate recital of our understanding, please contact me at once. I look forward to working with you, and eventually bringing this to a successful resolution.

(Appellant's Add. 17.)[3]  Eng received this letter and discussed it with his partner, Matthew Woods, but took no action on it.  On December 1, Acho also sent a letter to Richina, confirming that CMDA had referred Richina's case to Eng & Woods and reiterating the alleged one-third fee agreement Acho argues he made with Eng & Woods.  (See id. at 18.)  Acho made clear that this one-third fee agreement would not affect the overall amount of Richina's recovery.

Eng & Woods pursued the wrongful death claim in Missouri state court, with Woods acting as lead counsel for Richina and MitRahina.[4]  Acho received occasional oral updates on the status of the case from Eng and relayed this information to Fazio and Richina.  Acho also offered to fly in to help with depositions, but Eng told Acho that he had already done enough as a conduit to receive his fee.  The case settled in December 2007 for a total of $1,875,000, with $562,500 going to each Richina and MitRahina.[5]  From those amounts, the court directed Richina and MitRahina each to pay $187,500 in attorney's fees to Eng & Woods, for a total fee award of $375,000.  At the time the settlement distributions were made, Richina asked Eng if Acho would be receiving a portion of the fee, and Eng replied that Acho would get one-third of the fee paid to Eng & Woods.

In January 2008, after hearing that the case had settled, Acho contacted Eng about payment of his portion of the attorney's fee award, first via telephone and then

---

[3]As Eng & Woods notes, a literal reading of this letter seems to indicate that CMDA is entitled to one-third of the entire recovery on the case, i.e., the entire amount of Eng & Woods's attorney's fee award.  In context, however, it is clear that Acho intended CMDA to receive one-third of the attorney's fees paid to Eng & Woods, not one-third of the clients' total recovery.

[4]Beverly's third child, Lorene Barbiere, was represented by another firm.

[5]It appears that Barbiere received a larger portion of the settlement than Richina or MitRahina.

in a letter dated January 22, 2008. Acho argues that Eng acknowledged in this telephone call that there had been a fee arrangement, though Eng was not sure of the exact amount. The same day that Eng received Acho's January 22 letter, Woods sent Acho a check in the amount of $18,562.50 "in consideration for the contact information for purposes of obtaining Mr. Richina's case." This amount represented 10% of the fee from Richina, or 5% of Eng & Woods's entire fee from the case. Following his receipt of this check, Acho called Eng and the two had a heated argument about the amount of their fee arrangement. During this conversation, Eng told Acho that he would stop payment on the check unless Acho agreed to accept it. Acho agreed to accept the check but told Eng that he expected another check for the difference owed him under the alleged agreement. Eng stopped payment on the check.

Eng & Woods filed a declaratory judgment action against CMDA in federal court in May 2008, seeking a declaration that CMDA had no right to any portion of the attorney's fees recovered by Eng & Woods from Richina and MitRahina. CMDA counter-claimed for breach of contract, fraud and misrepresentation, unjust enrichment, and bad faith breach of duty. The parties filed cross-motions for summary judgment. The district court granted summary judgment for Eng & Woods, holding that, even if an agreement existed between Eng and Acho, the agreement was unenforceable under Missouri law because it did not comply with the Missouri Rules of Professional Conduct. The court also held that CMDA's counterclaims failed as a matter of law due to the unenforceability of the alleged fee agreement under Missouri law.

## II.

CMDA appeals the district court's grant of summary judgment in favor of Eng & Woods. First, CMDA argues that a fee-splitting agreement existed between Acho and Eng and that this agreement complied with both the letter and the purpose of the

Missouri Rules of Professional Conduct. Second, CMDA argues that, even if we find the fee-splitting agreement unenforceable, it should be allowed to pursue its claims of fraud, misrepresentation, and unjust enrichment.

"We review a district court's grant of summary judgment de novo, giving the nonmoving party the most favorable reading of the record as well as the benefit of [all] reasonable inferences that arise from the record." Gentry v. Georgia-Pacific Corp., 250 F.3d 646, 649 (8th Cir. 2001). "Summary judgment is appropriate only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Viking Supply v. Nat'l Cart Co., 310 F.3d 1092, 1095 (8th Cir. 2002). Disputes that are not "genuine," or that are about facts that are not "material," will not preclude summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). In a diversity action such as this, we apply state substantive law. See Gylten v. Swalboski, 246 F.3d 1139, 1141 (8th Cir. 2001). Our task is not to answer the factual question of whether an agreement between Eng and Acho actually existed. Rather, we must determine whether this agreement, if it did exist, complies with the Missouri Rules of Professional Conduct, and, if not, whether CMDA's counterclaims can stand.

## A.

"Attorney's fees are not owned, they are earned." Neilson v. McCloskey, 186 S.W.3d 285, 287 (Mo. Ct. App. 2005) (quotation and alteration omitted). If two attorneys from different firms wish to share the fees generated from a single case, they may do so "only if based on a sharing of services or responsibility." Londoff v. Vuylsteke, 996 S.W.2d 553, 557 (Mo. Ct. App. 1999). This principle is embodied in Missouri Supreme Court Rule 4-1.5(e), also known as Missouri Rule of Professional Conduct 1.5(e), which, at the time this alleged agreement between Acho and Eng was made, provided:

A division of fee between lawyers who are not in the same firm may be made only if:

(1) the division is in proportion to the services performed by each lawyer or, by written agreement with the client, each lawyer assumes joint responsibility for the representation;

(2) the client is advised of and does not object to the participation of all the lawyers involved; and

(3) the total fee is reasonable.

Mo. Sup. Ct. R. 4-1.5(e) (2006).[6]  The Rule "permits the lawyers to divide a fee . . . by agreement . . . if all assume responsibility for the representation as a whole and the client is advised and does not object."  Id. cmt.  "Rule 4-1.5 has the force and effect of law in Missouri."  Londoff, 996 S.W.2d at 557.

The parties do not dispute that the total fee was reasonable, or that, at least as pertains to Richina, the client did not object to the participation of both CMDA and Eng & Woods.  Rather, this case turns primarily on whether CMDA had a written agreement with Richina and MitRahina to assume joint responsibility for their representation, as required by Rule 4-1.5(e)(1).[7]  We agree with the district court that, assuming there was a fee-splitting agreement between Acho and Eng, this agreement did not comply with Rule 4-1.5(e).  First, there is no written agreement between CMDA and either Richina or MitRahina.  CMDA has produced no representation agreement with Richina or MitRahina, and Acho is "not certain if [Richina] returned a signed employment agreement or not."  (Appellant's Add. 6.)  Moreover, it appears that CMDA had no direct contact with MitRahina whatsoever, thus any argument that

---

[6]In 2007, Rule 4-1.5(e) was revised to allow fee splitting if "(1) . . . each lawyer assumes joint responsibility for the representation; (2) the client agrees to the association and the agreement is confirmed in writing; and (3) the total fee is reasonable."  Mo. Sup. Ct. R. 4-1.5(e) (Supp. 2009).

[7]At oral argument, CMDA made clear that it was not arguing it should be paid in proportion to the work it performed.

CMDA is entitled to a share of the attorney's fees from her recovery finds no support in Rule 4-1.5(e).[8]

Recognizing that this lack of a written agreement could be fatal its claim, CMDA argues that the December 1 letter Acho sent to Richina is sufficient to constitute a "written agreement" for purposes of Rule 4-1.5(e)(1) and that Richina's actions clearly demonstrate that he knew of and accepted the fee-splitting agreement. The December 1 letter purports to confirm earlier communications between Acho and Richina regarding a fee-splitting agreement, but we question whether Missouri courts would consider it to be a "written agreement." As the district court noted, "[i]f the version of Rule 4-1.5(e) in effect in 2006 had allowed for fee-splitting agreements where an attorney merely sent his or her client a letter confirming the client's agreement to the fee-splitting, the amendment in 2007 to specifically allow for this procedure would not have been necessary." Eng v. Cummings, McClorey, Davis & Acho, P.L.C., No. 08-4103, 2009 WL 1543840, at *6 (W.D. Mo. June 2, 2009). To be sure, the evidence demonstrates that Richina was aware of the fee-splitting arrangement, and while we might agree with CMDA that the underlying purpose of Rule 4-1.5(e)—to advise the client that each lawyer will assume joint responsibility for the case and ensure the client does not object—was satisfied here, the letter of the Rule was not.

CMDA argues that Tobin v. Jerry, 243 S.W.3d 437 (Mo. Ct. App. 2007), supports its position that the December 1 letter is sufficient to constitute a written agreement. In Tobin, an attorney sought to enforce the terms of a contingent fee agreement with his client by way of an attorney's lien. Id. at 440. During a hearing on the motion to enforce the lien, neither party was able to produce a signed copy of

---

[8]Due to this lack of communication with MitRahina, it appears that any alleged agreement to share the fee from her recovery also runs afoul of Rule 4-1.5(e)(2), which requires that "the client is advised of and does not object to the participation of all the lawyers involved."

the agreement.  Id.  Nevertheless, the trial court "found sufficient indicia of an agreement from all the facts and circumstances," such that the agreement was valid and enforceable under Missouri Rule of Professional Conduct 4-1.5(c).[9]  Id. (quotation omitted).  On appeal, the client argued that the lack of a signed copy of the agreement made the agreement unenforceable under Rule 4-1.5(c).  Id. at 441.  The Missouri Court of Appeals disagreed, noting that "the rule does not . . . require a signature" and that, in general, "a signature is not required in order to show mutuality or assent to the terms of a writing."  Id. (quotation and alteration omitted).

CMDA argues that we should construe Rule 4-1.5(e) the same way the Tobin Court construed Rule 4-1.5(c).  However, we see a key distinction: in Tobin, "the record [was] crystal clear [that] there was a signed agreement," 243 S.W.3d at 441, and the parties were simply unable to produce a signed copy of that agreement at trial.  That is not the case here, as the record clearly shows the lack of any signed agreement between CMDA and Richina or MitRahina.  Indeed, this case turns on whether a written agreement exists, whereas Tobin was primarily concerned with the terms of a written agreement that was acknowledged by both parties.  See id. at 441-42.  Thus, Tobin does little to advance CMDA's argument.

Second, even if the December 1 letter qualifies as a written agreement, it does not meet Rule 4-1.5(e)(1)'s joint responsibility requirement.  By its terms, Rule 4-1.5(e)(1) requires that the written agreement itself inform the client that each lawyer will assume joint responsibility for the case, not just that the lawyers will split the fee between them.  CMDA attempts to sidestep this requirement by pointing to the "many phone calls and . . . many contacts with the clients" that CMDA had during the

---

[9]At the time of the agreement, Rule 4-1.5(c) provided that "[a] contingent fee agreement shall be in writing and shall state the method by which the fee is to be determined."  Mo. Sup. Ct. R. 4-1.5(c) (2006).  The Rule has since been amended to require that the agreement be signed by the client.  See Mo. Sup. Ct. R. 4-1.5(c) (2009) ("A contingent fee agreement shall be in a writing signed by the client . . . .").

pendency of this case, arguing that this shows CMDA had assumed joint responsibility. (Appellant's Br. 28.) We disagree. Rule 4-1.5(e) requires that the written agreement itself state that each lawyer is jointly responsible. See Londoff, 996 S.W.2d at 557 ("[Plaintiff] contends the facts show he was jointly responsible. However, the rule requires a written agreement with the client in which each lawyer assumes joint responsibility for representation."). The fact that CMDA was in touch with one of the clients or could have been liable for malpractice if Richina or MitRahina were unhappy with their representation is not enough to show joint representation. See id. at 557-58 ("The facts that [plaintiff] did a few hours of work on the case before he referred it to defendants and that he may thereafter have been liable for malpractice damages or a portion of the costs do not satisfy the rule's requirement of a written contract.").

To the extent that CMDA's contact with the clients is relevant to our analysis of joint responsibility, it appears that CMDA overstates the amount and extent of contact it actually had with Richina and MitRahina and understates Eng & Woods's role in the case. CMDA has admitted that it had no direct contact whatsoever with MitRahina. And it appears to include Acho's contact with Fazio within its definition of "client contact." For example, in its brief, CMDA notes that "Mr. Acho received multiple telephone calls from Mr. Fazio while the litigation was pending requesting information on the status of the lawsuit[,]" (Appellant's Br. 28), and that "Mr. Acho had constant contact with Mr. Richina and Mr. Fazio throughout the handling of the case . . . [,]" (id. at 31 n.2). As Fazio was not a party to the wrongful death suit, any contact with him is arguably irrelevant to our analysis here. Thus, we are left with Acho's occasional telephone conversations with one client, Richina, as the entirety of CMDA's "client contact." While we can readily agree that keeping a client informed about the status of his case is an important element of the attorney/client relationship, we see nothing to substantiate CMDA's claim that Acho's contact with Richina and Fazio "was imperative to Eng garnering a successful outcome" in Richina's case. (Id. at 31 n.2.) Nor does the record show that "Eng & Woods was brought in only as the

-10-

trial specialist in a jurisdiction [in] which Mr. Acho did not practice." (Id.) Indeed, for all his purported contact with Richina, Acho was not even aware that the case had settled until a month after the fact, and even then only found out through Fazio, not Richina. (See Appellant's App. 90.)

Finally, even if CMDA's actions show the exercise of some level of professional responsibility, they do not amount to "joint responsibility" as that term is used in Rule 4-1.5(e)(1). The comments to the Rules state that "[j]oint responsibility for the representation entails the obligations stated in Rule 5.1 for purposes of the matter involved." Mo. Sup. Ct. R. 4-1.5(e) cmt. (2006).[10] Rule 5.1 addresses the responsibilities of partners, managers, and supervisory lawyers within a law firm, and requires them to "make reasonable efforts to ensure that . . . other lawyer[s] conform[] to the Rules of Professional Conduct." Mo. Sup. Ct. R. 4-5.1(b) (2006). Nothing that Acho did rises to this level. He did not file an appearance in the wrongful death action; he did not pay any portion of the court fees; he did not take depositions (although it appears at one point he offered to); and he did not assist Eng & Woods in formulating a trial strategy. Indeed, he appears to never have actually met Richina, MitRahina, or Eng. Acho's role appears to have been limited to occasional telephone conversations with one of the clients and with that client's uncle. "To merely . . . refer a case to another lawyer and to do nothing further in the handling of the case cannot be construed as performing service or discharging responsibility . . . ." McFarland v. George, 316 S.W.2d 662, 670 (Mo. Ct. App. 1958). While Acho's actions might amount to more than a mere referral, it is little more. Thus, we hold that any fee-splitting agreement between Acho and Eng did not comply with Rule 4-1.5(e).

_____

[10]Following the 2007 revisions to Rule 4-1.5(e), "[j]oint responsibility for the representation entails financial and ethical responsibility for the representation as if the lawyers were associated in a partnership." Mo. Sup. Ct. R. 4-1.5(e) cmt. (Supp. 2009).

As such, the agreement is unenforceable as a matter of law.[11]  See Neilson, 186 S.W.3d at 287 ("[A]n agreement to share attorney fees that does not comply with Rule 4-1.5(e) is unenforceable." (citing Londoff, 996 S.W.2d at 557)).

B.

Having determined that any alleged fee-splitting agreement between CMDA and Eng & Woods is unenforceable, we must next decide whether CMDA's counterclaims for fraud, misrepresentation, and unjust enrichment can stand.  The district court held that, because the fee agreement was unenforceable, CMDA could not recover on other claims based on that agreement.

Initially, we note that several of Eng & Woods's actions give us pause.  Eng received Acho's December 1 letter explaining the fee-splitting agreement and discussed it with Woods, but took no action on it, even though the letter asked Eng to contact Acho at once if it was "not an accurate recital of our understanding." (Appellant's Add. 17.)  Eng and Acho allegedly had a number of telephone conversations in which Eng reiterated the purported fee-splitting agreement and

---

[11]Although we are bound to apply settled Missouri law on this point, we note that other federal courts have come to different conclusions when interpreting rules similar to Rule 4-1.5(e).  See Freeman v. Mayer, 95 F.3d 569, 574-75 (7th Cir. 1996) (holding that a technical violation of the written-agreement requirement of Indiana Rule of Professional Conduct 1.5(e) did not operate to invalidate a fee-splitting agreement that was otherwise valid); Sanders v. Mueller, 133 F. App'x 37, 43 (4th Cir. 2005) (unpublished) ("A court must not declare invalid a fee-sharing agreement for violations [of the Maryland Rules of Professional Conduct] that are merely technical, incidental, or insubstantial or when it would be manifestly unfair and inequitable not to enforce the agreement." (quotation omitted)).  As in Freeman and Sanders, it appears that, if a fee-splitting agreement existed between Acho and Eng, Acho's violations of Rule 4-1.5(e) were merely technical, at least as to Richina. However, the fact remains that the agreement runs afoul of Rule 4-1.5(e) and is, therefore, unenforceable under Missouri law.

assured Acho that he had done enough to earn his share of the fee. After the case settled, Eng told Richina that Acho would be receiving one-third of the fee paid to Eng & Woods. And even though they now argue that any payment to CMDA would violate Rule 4-1.5(e), Eng & Woods sent Acho a $18,562.50 check "in consideration for the contact information for purposes of obtaining Mr. Richina's case." We find these actions to be inconsistent with Eng & Woods's argument that Eng never agreed to split the fee with CMDA, or that, even if an agreement did exist, it should not be enforced. Additionally, if, as Eng & Woods argues, there was never any fee-splitting agreement, then Acho effectively referred this case to Eng & Woods out of the kindness of his heart, for no fee whatsoever. This is simply not how the practice of law operates. See Goldfarb v. Va. State Bar, 421 U.S. 773, 788 (1975) ("It is no disparagement of the practice of law as a profession to acknowledge that it has [a] business aspect . . . .").

Nevertheless, we agree with the district court that the unenforceability of the alleged fee-splitting agreement is fatal to CMDA's counterclaims. Missouri courts have held that no cause of action lies for breach of contract or other claims seeking to recover on the basis of an unenforceable agreement. See Law Offices of Gary Green, P.C. v. Morrissey, 210 S.W.3d 421, 423, 425-26 (Mo. Ct. App. 2006) (affirming trial court's dismissal of claims for breach of contract, conversion, unjust enrichment, and declaratory judgment where plaintiff had failed to plead compliance with Rule 4-1.5(e)); Neilson, 186 S.W.3d at 287-88 (affirming trial court's dismissal of plaintiff's petition alleging "several tort theories" arising out of an unenforceable fee-splitting agreement for failure to state a claim); Londoff, 996 S.W.2d at 554-58 (affirming trial court's dismissal of plaintiff's claims for breach of contract, unjust enrichment, and conversion where the fee-splitting agreement did not comply with Rule 4-1.5(e)); see also Deja Vu of Mo., Inc. v. Talayna's Laclede's Landing, Inc., 34 S.W.3d 245, 248, 250 (Mo. Ct. App. 2000) (affirming trial court's entry of summary judgment on claims for breach of contract, fraud, negligent misrepresentation, unjust enrichment, and rescission where the claims were based upon an agreement that was

-13-

void as against public policy and "unenforceable both in law and equity"); <u>Lebcowitz v. Simms</u>, 300 S.W.2d 827, 830 (Mo. Ct. App. 1957) ("Where parties enter into an agreement in violation of the law, they will as a general rule be left in the position in which they put themselves."). Thus, we hold that CMDA's counterclaims for fraud, misrepresentation, and unjust enrichment cannot stand.

III.

Like our colleagues on the Missouri Court of Appeals, "[w]e on this Court are not so far removed from the real world not to know that in commerce between attorneys, attorneys must rely on the integrity of one another, and that promises made are to be promises kept." <u>Neilson</u>, 186 S.W.3d at 287-88. We find much to suggest that both CMDA and Eng & Woods have failed to live up to this standard. CMDA is attempting to recover approximately $125,000 in fees from a case in which it did little more than act as a conduit, and in which it had limited contact with only one of the clients. Had CMDA examined the Missouri Rules of Professional Conduct itself, it would likely have seen that this fee-splitting agreement would not pass muster.[12] For its part, Eng & Woods has engaged in sharp practice and is using the Rule 4-1.5(e) as a sword, forgetting that "the purpose of the Rules can be subverted when they are invoked by opposing parties as procedural weapons." Mo. Sup. Ct. R. 4, Scope, ¶ 20 (2009). Nevertheless, we are bound by Rule 4-1.5(e) and Missouri caselaw interpreting it. Therefore, we hold that the alleged fee-splitting agreement between CMDA and Eng & Woods is unenforceable and that CMDA's counterclaims fail as a matter of law.

---

[12]To the extent that CMDA may have relied upon its native Rules of Professional Conduct, we note that it appears this alleged agreement would have been valid. <u>See</u> Mich. Rules of Prof'l Conduct R. 1.5(e) (allowing lawyers to split a fee if "(1) the client is advised of and does not object to the participation of all lawyers involved; and (2) the total fee is reasonable").

For the foregoing reasons, we affirm.

RILEY, Chief Judge, concurring in part and dissenting in part.

I concur with the majority that Mo. Sup. Ct. Rule 4-1.5(e) bars all of CMDA's claims arising from the fee sharing agreement. Because I am convinced the Supreme Court of Missouri would allow CMDA's properly pled and preserved claim that it was fraudulently induced to enter into the agreement, I respectfully dissent.

Missouri courts recognize a distinction between fraudulent inducement to enter into a contract, and fraudulent misrepresentation based upon breach of a contract. See, e.g., Titan Constr. Co. v. Mark Twain K.C. Bank., 887 S.W.2d 454, 459 (Mo. Ct. App. 1994). Fraud arising from the breach of a contract does not amount to an independent tort, but fraud inducing entry into a contract does. See id.; see also Wages v. Young, 261 S.W.3d 711, 716 n.2 (Mo. Ct. App. 2008) ("Of course, . . . a plaintiff who enters a contract with a defendant may have a cause of action for fraudulent misrepresentations which induced the plaintiff to enter the contract. Here, however, [plaintiff] alleges 'fraudulent misrepresentation based on breach of contract,' not fraudulent inducement."). "A claim of fraud in the inducement arises when a party is induced to enter into an agreement through fraud or misrepresentation; the fraud relates not to the nature or purport of the contract but to the facts inducing its execution." 37 Am. Jur. 2d Fraud and Deceit § 2.

The majority affirms the dismissal of CMDA's fraudulent inducement claim based upon cases which either did not involve a fraud claim at all, see, e.g., Law Offices of Gary Green, P.C. v. Morrissey, 210 S.W.3d 421, 423 n.1 (Mo. Ct. App. 2006), Londoff v. Vuylsteke, 996 S.W.2d 553, 555 (Mo. Ct. App. 1999), or where the fraud claim at issue *arose from* an illegal agreement, see Deja Vu of Mo., Inc. v. Talayna's Laclede's Landing, Inc., 34 S.W.3d 245, 248, 250 (Mo. Ct. App. 2000), not where the agreement was induced by fraud. CMDA's fraudulent inducement claim

-15-

did not arise because of the illegal contract, the illegal contract arose because of the inducing fraud. Because CMDA's fraudulent inducement claim is independent of the agreement, the district court erred in dismissing the fraudulent inducement claim as arising from the illegal contract.

The majority also cites Lebcowitz v. Simms, 300 S.W.2d 827, 830 (Mo. Ct. App. 1957), another contract case, for the proposition "Where parties enter into an agreement in violation of the law, they will as a general rule be left in the position in which they put themselves." Lebcowitz is an application of the ancient maxim *in pari delicto, potior est conditio defendentis et possidentis*, or "In equal fault, better is the condition of defendants and possessors." Missouri has long recognized exceptions to this doctrine, see, e.g., Hobbs v. Boatright, 93 S.W. 934, 937 (Mo. 1906) (recognizing an exception where "both have not with the same knowledge, willingness, and wrongful intent engaged in the transaction, or the undertaking of each are not equally blameworthy"), where the parties are not *in pari delicto*, see also Restatement (Second) of Contracts § 198 (1981) ("A party has a claim in restitution for performance that he has rendered under or in return for a promise that is unenforceable on grounds of public policy if . . . he was not equally in the wrong with the promisor.").

CMDA is not in equal fault with Eng & Woods. CMDA was negligent in failing to determine under what circumstances Missouri's ethics rules permitted fee sharing agreements between attorneys. But the victim of fraud is often negligent, to a greater or lesser extent, in failing to investigate the fraudster. See Shechter v. Brewer, 344 S.W.2d 784, 788 (Mo. Ct. App. 1961) ("Since the very purpose of fraud is to cheat its victim by making him neglect the care essential to prevent injury, to deny relief because the victim was negligent would encourage the evil."). Taking the facts in the light most favorable to CMDA, it is reasonable to infer Eng & Woods was familiar with Rule 4-1.5(e) before it received Acho's query; it entered into the fee sharing agreement knowing its promises thereunder likely were unenforceable; and

throughout the course of the litigation, Eng & Woods lied to CMDA in an effort to minimize CMDA's involvement in the case, ultimately rendering the agreement illegal. In my view, Eng & Woods's intentional misconduct cannot be held *in pari delicto* with CMDA's negligence. For this additional reason, even if Missouri did not recognize an independent claim for fraudulent inducement, which it does, I would allow CMDA to proceed to trial on its fraudulent inducement claim.

_____